932 A.2d 783

# MARYLAND STATE BOARD OF PHYSICIANS

v.

## Harold I. EIST, M.D.

No. 329, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Sept. 13, 2007.

84

Thomas W. Keech (J. Joseph Curran, Jr. on the brief), Baltimore, for appellant.

Alfred F. Belcuore (on the brief), of Washington, DC, for appellee.

James C. Pyles (on the brief), of Washington, DC, for Amici Curiae.

Argued before DEBORAH S. EYLER, KRAUSER and WILLIAM W. WENNER, (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

The Maryland State Board of Physicians ("Board") received a written complaint against Harold Eist, M.D., a licensed psychiatrist, alleging that he was over-medicating three patients: the complainant's estranged wife (Patient A) and two of their children (Patients B and C).[1] At the time, the complainant and Patient A were litigants in an acrimonious divorce case, in which Dr. Eist had submitted an affidavit supporting Patient A's claim for custody.

In response to the complaint, the Board issued a subpoena *duces tecum* commanding Dr. Eist to produce "a copy of all medical records of" the three patients. When Dr. Eist informed the patients that their records had been subpoenaed, they invoked their federal constitutional right of privacy in the information in their records. Dr. Eist communicated that fact to the Board, as did counsel for the patients. Neither the Board nor Dr. Eist nor the patients instituted any legal proceeding to enforce or quash the Subpoena.

Eleven months later, the Board charged Dr. Eist with failing to cooperate with a lawful investigation conducted by the Board, in violation of Md.Code (1981, 2000 Repl.Vol., 2004 Supp.), section 14–404(a)(33) of the Health Occupations Article ("HO"). It again demanded that he produce the subpoenaed records. Dr. Eist informed his patients (and their counsel) of the charge, asked whether they still were invoking their privacy rights, and stated that, unless he heard from them to the contrary, he would assume that they were not doing so. When neither the patients nor their counsel objected to the records' being disclosed, Dr. Eist turned the patients' records over to the Board.

Ultimately, a peer review evaluation of the over-medication allegation was favorable to Dr. Eist and he was not charged with a standard of care violation. *See* HO section 14–

---

1. Pursuant to COMAR 10.32.02.08C, "the parties shall refrain from revealing ... information that would reveal the identity of any patients referenced in the Board's order."

404(a)(22) (authorizing the Board to discipline a physician for "[f]ail[ing] to meet appropriate standards as determined by appropriate peer review. . . ."). Nevertheless, the Board pursued the failure to cooperate charge. That charge came before an Administrative Law Judge ("ALJ"), who made a summary recommendation in favor of Dr. Eist. The Board rejected that recommendation and found Dr. Eist guilty of the charge.

In an action for judicial review, the Circuit Court for Montgomery County reversed the Board's decision and remanded the matter to the ALJ for further proceedings. After a contested case hearing, the ALJ made findings of fact and conclusions of law, again recommending a disposition in favor of Dr. Eist. The Board again rejected that recommendation, finding instead that Dr. Eist had failed to cooperate with a lawful investigation conducted by the Board by not producing the subpoenaed records. In a second action for judicial review, the circuit court reversed the Board's decision. The case at bar is the Board's appeal from that judgment.

We shall hold that, accepting the factual findings of the Board in its decision, to the extent they are supported by substantial evidence in the agency record, the evidence before the Board was legally insufficient to support its ruling that Dr. Eist failed to cooperate with a lawful investigation conducted by the Board. Accordingly, we shall affirm the judgment of the circuit court.

## PERTINENT STATUTES AND CASE LAW

### *The Medical Practices Act*

The professional conduct of physicians licensed in Maryland is regulated by the legislature pursuant to the Medical Practices Act ("MPA"), codified in HO sections 14–101 *et seq.* At the time pertinent to this case, the Act was administered by a 15–member Board.[2] HO § 14–202(a). The Board, comprised

---

2. Chapter 252, Acts 2003, effective July 1, 2003, made several changes to the structure of the Board. Prior to that date, the Board was known

of physicians and consumers, is responsible for the licensure and discipline of physicians in Maryland. It has adopted regulations governing the disciplinary process that are codified in the Code of Maryland Regulations ("COMAR") 10.32.02.

The Act authorizes the Board to reprimand a licensee, place a licensee on probation, or suspend or revoke a license to practice medicine for enumerated reasons, including the aforementioned failure to meet appropriate standards as determined by appropriate peer review, HO § 14–404(a)(22), and failure to cooperate with a lawful investigation conducted by the Board, HO § 14–404(a)(33). *See Solomon v. Bd. of Physician Quality Assurance,* 155 Md.App. 687, 845 A.2d 47 (2003) (affirming on judicial review revocation of a doctor's license to practice medicine for failure to cooperate with a lawful investigation of the Board).

When the Board receives a complaint alleging facts that may constitute grounds for disciplinary action under the MPA, it initiates a preliminary investigation. HO § 14–401(a); COMAR 10.32.02.03A. The Board is vested with the authority to issue subpoenas in connection with any investigation and any hearing before it. HO § 14–401(h).

If a complaint alleges that the licensee failed to adhere to appropriate standards of care in his treatment of a patient or patients and, after an initial investigation, the Board elects to pursue further investigation, the Board then refers the complaint to the Maryland State Medical Society for physician peer review. HO § 14–401(c)(2); COMAR 10.32.02.03(B)(1). At the time relevant to this case, the Maryland State Medical Society was known as the Medical and Chirurgical Faculty of Maryland ("MedChi"), so we shall use that designation.

The Board and MedChi have adopted a "Peer Review Handbook" for the peer review process. MedChi prepares a report addressing the allegations against the physician and

as the State Board of Physician Quality Assurance. The 2003 legislation also raised the number of Board members from 15 to 21.

submits it to the Board. After receiving the MedChi report, the Board determines whether reasonable cause exists to charge the physician with a failure to meet appropriate standards of care. COMAR 10.32.02.03(B)(2). If the Board files a charge, it refers the matter to an administrative prosecutor and sends notice to the physician. COMAR 10.32.02.03(C).

At that point, the physician is entitled to a contested case hearing before an ALJ, in the Office of Administrative Hearings ("OAH"), pursuant to the Administrative Procedure Act ("APA"), Md.Code (1984, 1999 Repl.Vol.), section 10–201 *et seq.* of the State Government Article ("SG"); HO § 14–405(a); *see also* COMAR 10.32.02.03(D). Following the hearing, the ALJ issues findings of fact, conclusions of law, and a proposed disposition. COMAR 10.32.02.03(E)(10). When the charge against the physician is failure to meet appropriate standards of care in violation of HO section 14–404(a)(22), the standard of proof is clear and convincing evidence. HO § 14–405(b)(3).[3]

Either party may file exceptions to the ALJ's findings and proposed disposition. COMAR 10.32.02.03(F).

The Board is not bound by the decision of the ALJ. HO § 14–405(e); *see Board v. Bernstein,* 167 Md.App. 714, 721, 894 A.2d 621 (2006). *Compare* Md.Code (1994, 2004 Rep l. Vol.), § 11–110(d)(3) of the State Personnel and Pensions Article (providing that "the decision of the [OAH] is the final administrative decision"). After receiving the ALJ's proposed decision, the Board must review the record and the ALJ's proposal and hold a hearing on any exceptions. COMAR 10.32.02.03(F). It then issues a final decision stating its findings of facts, conclusions of law, and a disposition of the charge. COMAR 10.32.02.03(E)(10).

The Board's final decision is subject to judicial review in the circuit court in accordance with the APA, and then to appeal to this Court. HO § 14–408(b).

---

**3.** Ch. 5, Acts of 2004, 1st Spec. Sess., effective January 11, 2005, amended HO § 140–405(b)(3) to require proof only by a preponderance of the evidence for all factual findings.

### The Statutory Psychiatrist–Patient Privilege and The Maryland Confidentiality of Mental Health Records Act

Maryland law recognizes a psychiatrist-patient privilege, which is codified at Md.Code (1973, 2006 Repl.Vol.), section 9–109 of the Courts and Judicial Proceedings Article ("CJ").[4] That provision states, in pertinent part:

> (b) Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a patient or the patient's authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing:
>
> (1) Communications relating to diagnosis or treatment of the patient; or
>
> (2) Any information that by its nature would show the existence of a medical record of the diagnosis or treatment.

The statute sets forth exclusions, none of which pertain to health care professional disciplinary investigations.[5]

---

**4.** The privilege also applies to communications between a patient and a psychologist.

**5.** The privilege does not exist if:
(1) A disclosure is necessary for the purposes of placing the patient in a facility for mental illness; (2) A judge finds that the patient, after being informed there will be no privilege, makes communications in the course of an examination ordered by the court and the issue at trial involves his mental or emotional disorder; (3) In a civil or criminal proceeding: (i) The patient introduces his mental condition as an element of his claim or defense; or (ii) After the patient's death, his mental condition is introduced by any party claiming or defending through or as a beneficiary of the patient; (4) The patient, an authorized representative of the patient, or the personal representative of the patient makes a claim against the psychiatrist or licensed psychologist for malpractice; (5) Related to civil or criminal proceedings under defective delinquency proceedings; or (6) The patient expressly consents to waive the privilege, or in the case of death or disability, his personal or authorized representative waives the privilege for purpose of making claim or bringing suit on a policy of insurance on life, health, or physical condition.
CJ § 9–109(d).

In addition to the privilege that attaches to communications between a psychiatrist and a patient, psychiatric treatment records are medical records covered by the Maryland Confidentiality of Medical Records Act ("CMRA"), codified in Md. Code (1982, 2005 Repl.Vol., 2006 Supp.), section 4–301 *et seq.* of the Health General Article ("HG"). Those statutes require that health care providers keep patient records confidential and disclose them only in accordance with the dictates of that subtitle or as otherwise provided by law. HG § 4–302(a). Dr. Eist is a "health care provider" within the meaning of HG section 4–301(g).[6]

HG section 4–306(b)(2) governs disclosure of medical records for use in investigations without the authority of a person in interest (which in this case would be Patient A and any person authorized to act on behalf of Patients B and C).[7] As

---

6. HG section 4–306(b)(2) provides, in pertinent part:
 *Permitted disclosures.*—A health care provider shall disclose a medical record without the authorization of a person in interest:
 . . . . .
 (2) Subject to the additional limitations for a medical record developed primarily in connection with the provision of mental health services in [HG section] 4–307 of this subtitle, to health professional licensing and disciplinary boards, in accordance with a subpoena for medical records for the sole purpose of an investigation regarding:
 (i) Licensure, certification, or discipline of a health professional; or
 (ii) The improper practice of a health profession; . . . .

7. A "person in interest" is defined in HG section 4–301(k) as follows:
 (1) An adult on whom a health care provider maintains a medical record;
 (2) A person authorized to consent to health care for an adult consistent with the authority granted;
 (3) A duly appointed personal representative of a deceased person;
 (4)(i) A minor, if the medical record concerns treatment to which the minor has the right to consent and has consented under Title 20, Subtitle 1 of this article; or
 (ii) A parent, guardian, custodian, or a representative of the minor designated by a court, in the discretion of the attending physician who provided the treatment to the minor, as provided in § 20–102 or § 20–104 of this article;
 (5) If paragraph (4) of this subsection does not apply to a minor:
 (i) A parent of the minor, except if the parent's authority to consent to health care for the minor has been specifically limited by a court

relevant to this case, "[s]ubject to the additional limitations for a medical record developed primarily in connection with the provision of mental health services in [HG section] 4–307," a health care provider "shall disclose a medical record without the authorization of a person in interest" "to health professional licensing and disciplinary boards, in accordance with a subpoena for medical records for the sole purpose of an investigation regarding: (i) Licensure, certification, or discipline of a health professional; or (ii) the improper practice of a health profession[.]" HG § 4–306(b)(2).

With respect to disciplinary investigations, HG section 4–307, applicable specifically to mental health records, states that a health care provider

> shall disclose a medical record without the authorization of a person in interest ... [i]n accordance with a subpoena for medical records on specific recipients [of mental health services]: ... 1. To health professional licensing and disciplinary boards for the sole purpose of an investigation regarding licensure, certification, or discipline of a health professional or the improper practice of a health profession....

HG § 4–307(k)(1)(v)(1). It further provides, however, that subsection (k) "may not preclude a health care provider, a recipient, or person in interest from asserting in a motion to quash or a motion for a protective order any constitutional right or other legal authority in opposition to disclosure." HG § 4–307(k)(6).

### The Dr. K. Case

In *Dr. K. v. State Board*, 98 Md.App. 103, 632 A.2d 453 (1993), two psychiatrists lodged a complaint with the Board against their colleague, Dr. K. The psychiatrists accused Dr.

---

order or a valid separation agreement entered into by the parents of the minor; or

(ii) A person authorized to consent to health care for the minor consistent with the authority granted; or

(6) An attorney appointed in writing by a person listed in paragraph (1), (2), (3), (4), or (5) of this subsection.

K. of engaging in a romantic relationship with a patient. Before making their complaint, they met with Dr. K. to discuss the matter. Dr. K. admitted that he was romantically involved with the patient but took the position that the relationship did not violate any professional standard because it started after the patient was no longer under his care. The colleagues told Dr. K. they were going to proceed with filing a complaint against him with the Board because, in their professional opinions, it always is an ethical breach for a psychiatrist to engage in a romantic relationship with a patient, even a former patient.

Upon receiving the complaint, the Board initiated an investigation and issued a subpoena *duces tecum* for Dr. K.'s medical records of the patient. Dr. K. asked the patient if she would consent to the release of her records and she said she would not. He then filed in the circuit court an action to quash the Board's subpoena. The Board filed an opposition and a motion to compel enforcement. The court refused to quash the subpoena, but stayed its order for 30 days to allow for an appeal. At that point, the patient intervened and moved for reconsideration, arguing that her federal constitutional right of privacy would be violated if the Board's subpoena were enforced. That motion was denied, and an appeal proceeded in this Court.

Following the lead of the Third Circuit Court of Appeals in *United States v. Westinghouse Electric Corp.*, 638 F.2d 570 (3rd Cir.1980), this Court held that the patient had a federal constitutional right of privacy in not having the information in her psychiatric records disclosed to a government agency. *Dr. K, supra*, 98 Md.App. at 112, 632 A.2d 453. *See also In re Search Warrant (Sealed)*, 810 F.2d 67, 71 (3rd Cir.1987); *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir.1995) (both recognizing federal constitutional right to privacy in certain types of medical information); *Powell v. Schriver*, 175 F.3d 107, 111 (2nd Cir.1999), *Doe v. City of New York*, 15 F.3d 264, 266–67 (2nd Cir.1994) (hereinafter *"City of New York"*); *Schachter v. Whalen*, 581 F.2d 35 (2nd Cir.1978) (*per curiam*) (recognizing a federal constitutional right to maintain confi-

dentiality in certain personal health matters); and *Hodge v. Carroll County Dept. of Social Servs.*, 812 F.Supp. 593, 600 (D.Md.1992).[8] *But see Jarvis v. Wellman*, 52 F.3d 125–26 (6th Cir.1995) (holding in 42 U.S.C. section 1983 civil rights action that the federal constitution does not encompass a general right to nondisclosure of private information and therefore disclosure by government officials of plaintiff's medical records to her incarcerated father did not "rise to the level of a breach

---

**8.** The United States Supreme Court has not directly held that the federal constitution confers upon individuals a right of privacy against government intrusion into information in their medical records. In *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Court was confronted with a facial constitutional challenge to a New York statute mandating that state authorities receive copies of all prescriptions written for certain narcotic drugs. The Court upheld the legislation as a reasonable exercise of the state's police power. One of the arguments put forth by the challengers (physicians and patients) was that the statute was facially unconstitutional as it invaded a "constitutionally protected 'zone of privacy.'" *Id.* at 598, 97 S.Ct. 869. The Court assumed that the right of privacy founded upon the Fourteenth Amendment concept of personal liberty, as recognized in *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), encompasses an interest in avoiding disclosure of personal matters and an interest in independence in making certain kinds of important decisions; it concluded, however, that "the New York program does not, on its face, pose a sufficiently grievous threat to either interest to establish a constitutional violation." *Whalen, supra,* 429 U.S. at 600, 97 S.Ct. 869.

In *Ferguson v. City of Charleston,* 186 F.3d 469, 482–83 (4th Cir. 1999), the appellate court assumed, *arguendo,* that a constitutionally protected right of privacy exists in the information in a person's medical records. There, in order to avert the growing problem of harm to newborns caused by pregnant mothers' using crack cocaine, a state hospital and law enforcement authorities required pregnant women receiving prenatal care to undergo urine screening tests for cocaine. Positive test results were used as a basis for criminal prosecutions against the women. The Fourth Circuit ruled, *inter alia,* that the testing was not an unreasonable search under the Fourth Amendment, and that any privacy right the women had in their medical information had not been violated by disclosure of the urine testing records in that case. The Supreme Court granted *certiorari* on the Fourth Amendment issue only, and reversed on the ground that the tests were unreasonable searches. 532 U.S. 67, 86, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). In that context, the Court observed that individuals have a "reasonable expectation of privacy" in their medical information. *Id.* at 78, 121 S.Ct. 1281. It did not address the existence *vel non* of a constitutional privacy interest in medical information.

of a right recognized as 'fundamental'" under the federal constitution); *Doe v. Wigginton*, 21 F.3d 733, 740 (6th Cir.1994)(disclosure by government agent of patient's HIV status did not violate a federal constitutional right of privacy); *J.P. v. DeSanti*, 653 F.2d 1080, 1090 (6th Cir.1981) (holding that the federal constitution does not confer a general privacy right to nondisclosure of personal information). *See also Citizens for Health v. Leavitt*, 428 F.3d 167, 177 (3rd Cir.2005) (holding that "a violation of a citizen's right to medical privacy rises to the level of a *constitutional* claim only when that violation can properly be ascribed to the government") (emphasis in original); *F.E.R. v. Valdez*, 58 F.3d 1530, 1535 (10th Cir.1995) (recognizing a constitutional right to privacy in preventing disclosure by the government of personal matters).

We explained in *Dr. K.* that the federal constitutional right of privacy in medical records is not absolute; rather, " 'the individual privacy interest in the patients' medical records must be balanced against the legitimate interests of the state in securing the information contained therein.' " 98 Md.App. at 114, 632 A.2d 453 (quoting *In re Search Warrant (Sealed)*, *supra*, 810 F.2d at 71–72). When the right of privacy is applicable, " 'regulation limiting it must be justified by a 'compelling state interest.' " *Id.* at 111 (quoting *Montgomery County v. Walsh*, 274 Md. 502, 512, 336 A.2d 97 (1975), *appeal dismissed*, 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306 (1976)).

■ We held that, in balancing a patient's right of privacy in her medical records against the government's competing need to obtain the records, the court should consider the following factors:

[T]he type of record requested, the information it contains, the potential for harm in subsequent nonconsensual disclosure, the injury in disclosure to the relationship for which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the government's need for access, and whether there is an express statutory mandate, articulate public policy, or other public interest militating towards access.

*Dr. K., supra,* 98 Md.App. at 115, 632 A.2d 453 (citing *Westinghouse Elec. Corp., supra,* 638 F.2d at 578) ("the *Westinghouse* factors").

Upon analysis of the *Westinghouse* factors, we concluded that the patient's "constitutional right to privacy in her medical records pertaining to her treatment by Dr. K" was "outweighed by the State's compelling interest in obtaining those records for the purpose of investigating possible disciplinary action against Dr. K." 98 Md.App. at 122, 632 A.2d 453. On that basis, we affirmed the judgment of the circuit court.

### The *Doe v. Maryland Board of Social Work Examiners* Case

More recently, in *Doe v. Maryland Board of Social Work Examiners,* 384 Md. 161, 862 A.2d 996 (2004), the Court of Appeals approved this Court's analysis in *Dr. K.* and applied the *Westinghouse* factors in deciding whether a health care profession disciplinary agency's statutory right to obtain mental health records, by subpoena, for purposes of investigating a complaint against a health care provider outweighed the federal constitutional privacy rights of the patients on whom the records were kept. The Court concluded that, under the facts of that case, the agency's compelling state interest in investigating whether a social worker was failing in her legal obligation to report suspected child sexual abuse to the authorities, pursuant to Md.Code (1984, 2006 Repl.Vol.), section 5–704 of the Family Law Article ("FL"), outweighed the patients' privacy rights in their records.

In that case, in July 2001, the Maryland Board of Social Work Examiners ("Social Work Board") received a complaint against a social worker alleging that she had not reported to the authorities information she had gained, in treating a former client, John Doe, and his wife, Jane Doe, that John Doe had sexually abused the couple's minor granddaughter. The complaint included newspaper articles about John Doe's having been convicted, the month before, of child abuse and third degree sex offenses against his granddaughter. (The sexual abuse had been brought to the attention of the authori-

ties by the granddaughter's pediatrician, to whom she disclosed it. *Doe v. Board of Social Workers,* 154 Md.App. 520, 527 n. 2, 840 A.2d 744. (2004)). Although the source of the complaint to the Social Work Board is not revealed in the opinion of the Court of Appeals or this Court in the case, it clearly was not the Does.

Upon receipt of the complaint, the Social Work Board conducted a preliminary investigation that revealed "substantial evidence" that the social worker "had acted in her professional capacity . . . in such a way as to be subject to discipline" under the governing statute, which empowered it to discipline a social worker for, among other things, not reporting suspected child abuse in violation of FL section 5–704. *Doe, supra,* 384 Md. at 173, 862 A.2d 996. After the preliminary investigation, the Social Work Board issued the subpoena *duces tecum* to the social worker commanding her to produce her records for the Does.

The Does responded by filing an action in the circuit court, seeking to quash the subpoena on the ground that they had a state statutory right and a federal constitutional privacy right not to have their mental health records disclosed to the Social Work Board. The court ruled against the Does on their statutory claim and, after engaging in an analysis of the *Westinghouse* factors, also ruled against them on their constitutional privacy right assertion. It stayed enforcement of the subpoena pending appeal. After this Court affirmed the circuit court's ruling, the Court of Appeals granted a petition for writ of *certiorari.*

The Court of Appeals likewise affirmed the circuit court's ruling. On the statutory issue, it held that Maryland's social worker-patient privilege must yield to the Social Work Board's power, also conferred by statute, to obtain social work records in order to investigate allegations that one of its licensees committed a serious violation of her professional duties.

Turning to the federal constitutional privacy right issue, the Court explained that when a patient has asserted such a challenge to the disclosure of his mental health records to the

Social Work Board, that agency "must show a 'compelling state interest' before it will be allowed to infringe on [the clients'] privacy rights regarding their treatment records." *Doe, supra,* 384 Md. at 183–84, 862 A.2d 996. The Court held that a balancing analysis that takes the *Westinghouse* factors into consideration is the proper standard for weighing "individual privacy interests in medical records against competing state interests in those records," *id.* at 186, 862 A.2d 996; and that "[w]hether a compelling state interest can be shown in order to override an individual's privacy interest is to be determined on a case-by-case basis." *Id.*

The Court proceeded to apply the *Westinghouse* factors to the underlying facts, ultimately concluding that, in that case, the public's interest in having the social worker investigated for the alleged failure to report suspected child abuse, in violation of a mandatory reporting statute, and to have her properly disciplined for such a violation, was compelling and outweighed the clients' privacy interests in their mental health records.[9]

## FACTS AND PROCEEDINGS

Dr. Eist became licensed to practice medicine in Maryland in 1967, and has actively practiced in the field of psychiatry since then. At the time relevant to this case, he was the Medical Director of Montgomery Child and Family Health Services, Inc., held a teaching position at the George Washing-

---

9. In *Doe,* the Social Work Board not only subpoenaed the records of the Does but also subpoenaed the records of other clients of the social worker, to determine whether she had not disclosed reports of child abuse made by other clients. A majority of the Court of Appeals held that the Social Work Board's compelling interest in investigating the social worker for failure to abide by the mandatory reporting statute outweighed the privacy interests of all of the clients (the Does and the others) in their mental health records. Judge Battaglia wrote a dissent, in which Judge Raker joined, asserting that, although the Social Work Board's governmental interest in obtaining the mental health records of the Does outweighed the Does' privacy interests in their records, that was not the case for the records of the other clients. The majority and dissenting judges all agreed, however, that individuals have a federal constitutional right of privacy in their mental health records.

ton University Medical School, and was engaged in the full-time practice of child, adolescent, and adult psychiatry and psychoanalysis.

Dr. Eist started treating Patient A intermittently in 1996, when her regular psychiatrist was unavailable due to illness. He became Patient A's regular treating psychiatrist in mid–1999. Eventually, Dr. Eist also began treating Patient A's sons, Patients B and C, who at the time were ages 14 and 10, respectively. (An older son was not in treatment.) By then, Patient A was separated from her husband, Mr. S., and the two were embroiled in contentious divorce litigation in the Circuit Court for Montgomery County ("Domestic Case"). Among other things, Mr. S was alleging that Patient A was unfit to parent the children because she was addicted to drugs.

On July 13, 2000, at the request of Patient A's lawyer in the Domestic Case, Dr. Eist prepared an affidavit providing background information about his psychiatrist-patient relationships with Patients A, B, and C, and setting forth his diagnosis and medication regimen for each patient. He expressed the view to a reasonable degree of medical certainty that Patient A had taken the medications he had prescribed in appropriate dosages, that she was responding positively to the treatment he was rendering, and that the conditions for which Patient A was being treated had not in the past and were not presently adversely affecting her ability to care for her children. Dr. Eist concluded by attesting that Patient A "is a quality, stable, and competent caretaker of her three children." Dr. Eist's affidavit was filed in the Domestic Case. It also was faxed to Mr. S's office.

### Complaint and Preliminary Investigation

Seven months later, on February 19, 2001, Mr. S wrote a letter to the Board complaining about Dr. Eist. Mr. S is a lawyer, and his two-page, single-spaced letter was written on his law firm's letterhead. In the second paragraph, Mr. S stated:

Dr. Eist is a psychopharmacologist who has been attending my wife and two of my children for the past two years. In

that time, he has, in my opinion, over-medicated my wife and my sons. My wife has become overly psychotic and seriously anxious and depressed, and my son, [J.S.], has become increasingly more agitated and difficult to control over the course of Dr. Eist's intervention.[10] I have tried to discuss these concerns with him, and each time he has explained to me that his medicine regime is perfect.

The Board characterized this one-paragraph allegation as a "standard of care" complaint.

The rest of Mr. S's letter was devoted to an alleged incident, on February 8, 2001, in which, according to Mr. S, Dr. Eist embarrassed him in front of his two sons by berating him for not having paid a bill and not having brought a credit card or a check with him to pay for a family counseling session. Mr. S accused Dr. Eist of having "an ego the size of a country" that "interferes with his ability to judge situations professionally and objectively." The Board characterized this allegation as an "unprofessional conduct" complaint.

For reasons not entirely clear from the record, the Board did not receive Mr. S's letter of complaint until March 13, 2001, almost a month after it was written.[11] According to Barbara K. Vona, Chief of Compliance Administration for the Board, upon receipt of the complaint letter, Harold Rose, the Chief of the Intake Unit, began a preliminary investigation.

---

**10.** Elsewhere in the letter, Mr. S stated that he and his wife were separated.

**11.** At the August 2004 hearing before the ALJ, there was evidence that Dr. Eist's deposition was taken by counsel for Mr. S in the Domestic Case in March 2001, after Mr. S wrote the complaint letter but before it was received by the Board. Mr. S acknowledged in his testimony that, before the March 2001 deposition, he told his lawyer in the Domestic Case that he had made a complaint to the Board against Dr. Eist. In the deposition, the lawyer asked Dr. Eist whether he ever had had a disciplinary complaint filed against him. Dr. Eist answered that question in the negative. He would not have known of Mr. S's complaint letter at that time, because, although it had been written, it had not been received by the Board. It would appear that, by the time of the deposition, Mr. S had written the letter of complaint but had not mailed it.

He read the complaint letter and summarized it. Two days later, on March 15, 2001, he wrote to Dr. Eist, notifying him of the complaint, enclosing a copy of the letter, and requesting a written, signed response within 21 days. In his letter, Mr. Rose asked Dr. Eist whether he would consent "to release any or all of the information contained in your response to the complainant," *i.e.,* to Mr. S.

In addition, Mr. Rose's March 15 letter enclosed a subpoena *duces tecum,* of the same date, commanding Dr. Eist to produce within 10 days "a copy of all medical records of" Patients A, B, and C "in [his] custody, possession or control[.]" ("the Subpoena").

The Board did not inform any of the three patients about Mr. S's complaint against Dr. Eist or that their psychiatric records had been subpoenaed.

Dr. Eist received Mr. Rose's March 15, 2001 letter and the enclosed Subpoena on April 19, 2001.[12] He immediately called Mr. Rose and told him that the complaint was false, that the complainant was the estranged husband of Patient A, and that the husband and wife were involved in a "contentious, vitriolic divorce" in which custody was an issue. He asked Mr. Rose whether he was aware that he (Dr. Eist) could not release Patient A's psychiatric records without her permission and also could not release the boys' psychiatric records without obtaining consent on their behalf. According to Dr. Eist, Mr. Rose told him that he was wrong and that he had to produce the records. Dr. Eist then called Armin U. Kuder, Esquire, for advice. Mr. Kuder told him that Mr. Rose was wrong and that it was essential to obtain the patients' permission before disclosing their mental health records.

---

12. Mr. Rose's March 15, 2001 letter was sent to the wrong address and was returned to the Board by the postal service. On April 18, 2001, the March 15 letter was mailed again, this time to the correct address for Dr. Eist. The Board concedes that, because Dr. Eist did not receive the Subpoena until April 19, the ten day period in which to produce records started to run from that time, not from March 15.

After those conversations, Dr. Eist called Patient A, told her that her mental health records and those of her two sons had been subpoenaed, and apprised her of the nature and source of the complaint against him. Dr. Eist told Patient A that he would release the records to the Board if she and the boys had no objection to his doing so.

The next day, April 20, 2001, Dr. Eist wrote to Mr. Rose, acknowledging receipt of his March 15 letter and the Subpoena, and objecting to any information he might furnish being given to Mr. S. He put in writing that the S's were involved in an ugly divorce and custody case. He went on to state that it was his belief that Patient A and the two boys were required to be notified that their mental health records were being sought and that he was being asked to divulge their confidential communications. Dr. Eist wrote:

> I will be pleased to cooperate fully with any investigator with the consent of the patients (including any guardian necessary to waive the children's privilege), or, if the patients object and take steps to protect their communications with any appropriate decision overruling their objections and requiring that I furnish the information.

On May 1, 2001, Dr. Eist wrote to Patient A, enclosing a copy of the Subpoena and stating (as he had told her over the telephone) that her records and those of the boys were being requested due to the complaint against him by Mr. S. Dr. Eist asked Patient A to let him know as soon as she could whether she or her lawyer "are taking any action to oppose my compliance with this subpoena." He closed by saying that if he did not hear from her within a week, he would forward the records to the Board. Dr. Eist sent a copy of that letter to Mr. Rose.

In the meantime, in the Domestic Case, counsel had been appointed for the minor children, for the purpose of deciding whether to waive their privilege with respect to their communications with mental health professionals. *See Nagle v. Hooks,* 296 Md. 123, 460 A.2d 49 (1983). On May 4, 2001, the children's lawyer submitted a report to the court, explaining

that she had met with many of the mental health care professionals involved in treating the children, including Dr. Eist, and had determined that it would not be in the children's best interests to waive their privilege with several of the providers, including Dr. Eist.

Dr. Eist was sent a copy of that report. He received it on May 9, 2001, and forwarded it to Mr. Rose that same day. In his cover letter to Mr. Rose, Dr. Eist quoted a recorded telephone message he just had received from Patient A, in which she said,

"I tried to contact you, I refuse to allow you to release my medical record to the medical board, I want to write to the medical board telling them what a liar my husband is, I can't believe the things he said in the compliant [sic]. I want them to know how helpful you have been to my children."

Dr. Eist concluded his letter by inquiring whether Mr. Rose had gotten in touch with Patient A's lawyer or the children's lawyer, and stating, "As you know, I want to cooperate with the [Board]."

### Full Investigation

It is the Board's usual practice that, once a physician has responded in writing to a complaint against him, and has produced the records the Board has subpoenaed, the matter is presented to a panel of the Board for review and direction. Here, also on May 9, 2001, Mr. Rose presented Mr. S's complaint letter against Dr. Eist to a panel of the Board. The panel did not yet have a response from Dr. Eist to Mr. S's standard of care and unprofessional conduct allegations and did not have the medical records, for the reasons that were communicated by Dr. Eist in his letters to Mr. Rose. The Board panel reviewed the matter, however, and directed that Mr. S's complaint be opened for a full investigation.

A few days later, on May 14, 2001, Patient A's lawyer in the Domestic Case wrote to Mr. Rose, stating that his client "does not waive her privilege with Dr. Eist and has asked that he

not release her records in response to the request from your office. Mrs. S[] wants you to know that she has absolutely no complaints about Dr. Eist and reports that he has always conducted himself in a professional manner."

Sometime in late May 2001, Mr. S's complaint was assigned to Frank Bubczyk, a Compliance Analyst for the Board, to oversee the full investigation. On June 27, 2001, he wrote a "Personal and Confidential" letter to Dr. Eist stating that the Board "has opened an investigation and is requesting a response to these allegations in writing within 5 days of receipt of this letter." The letter went on to say that the Board had not yet received the documents that were subpoenaed on March 15. "For your information," the letter said, "receipt of those medical records is not contingent upon the consent of the patient/s." The letter enclosed a copy of the Subpoena and directed Dr. Eist to produce the records "within forty-eight hours of the receipt of this letter." It admonished that failure to comply with the Subpoena within that time frame "may be grounds for disciplinary action pursuant to [HO section] 14–404(a)(33) for fail[ing] to cooperate with a lawful investigation conducted by the Board."

Dr. Eist did not receive Mr. Bubczyk's letter until July 7, 2001. He contacted Mr. Kuder, who on July 11 responded to Mr. Bubczyk in writing. Mr. Kuder gave background information about the Domestic Case for context, and said that Dr. Eist was preparing, and shortly would send, a written response to Mr. S's unprofessional conduct allegation. Mr. Kuder went on to say that, to the extent the Board was considering the "allegations" against Dr. Eist to include Mr. S's complaint about the propriety of the treatment being rendered to Patients A, B, and C (*i.e.*, the standard of care allegation), "Dr. Eist is under the impression that he does not have his patients' permission to reveal their confidences, and that no court has weighed the necessity for violating their confidences based upon the unsupported allegations of someone with a clear conflict of interest, and a desire to violate those confidences."

Mr. Kuder enclosed the correspondence previously sent to Mr. Rose, including the letters from the lawyers for the patients opposing disclosure of the subpoenaed mental health records. Speaking for himself and Dr. Eist, Mr. Kuder stated:

[W]e believe that the communications of persons who are uninvolved in the complaint, who have legitimate privacy and confidentiality issues, and who are engaged in litigation with the complainant, should be examined and thoughtfully dealt with. Has this been done by the Board? What action has been taken with respect to [Patient A's lawyer's] letter? This is not a case of defiance by Dr. Eist of the Board's authority, but the effort of a conscientious psychiatrist attempting to meet the conflicting ethical and legal obligations with which he is faced.

It would appear that it is incumbent upon the Board to address [Patient A's] communications, as well as those made on behalf of her children. It should not be Dr. Eist's responsibility to say to them that they have no confidentiality rights. If the Board so acts, and persuades a court of this, should [Patient A and her children] pursue that route, then Dr. Eist certainly will comply. It is inappropriate to threaten him with punishment without first dealing with the issues raised by [Patient A] and the children. We have no communication to date indicating that those issues have been addressed.

On July 16, 2001, Dr. Eist wrote a 9–page single-spaced letter to Mr. Bubczyk, recounting in detail his interactions with Mr. S concerning billing, and the family's history of dysfunction that ultimately resulted in the acrimonious Domestic Case; and countering the allegation that he had acted improperly in handling the billing dispute (*i.e.,* the unprofessional conduct allegation). The Board never took any action against Dr. Eist with respect to the unprofessional conduct allegation, and it concedes that it was not necessary to review Dr. Eist's psychiatric records of the three patients to assess that allegation.

Neither Mr. Bubcyzk nor anyone else with the Board responded to Mr. Kuder's July 11, 2001 letter. Likewise, there was no response to Dr. Eist's July 16, 2001 letter.

In September 2001, the Board issued subpoenaes to several pharmacies, seeking records of medications dispensed to the three patients from January 1, 1998, through the subpoena response date of October 25, 2001. The Board received pharmacy print-outs in response to the subpoenaes.

### The Board Charges Dr. Eist with Failure to Cooperate with a Lawful Investigation

On December 19, 2001, the Board voted to charge Dr. Eist with "failing to cooperate with a lawful investigation," under HO section 14–404(a)(33), based upon his not having produced the three patients' psychiatric records in response to the Subpoena. The matter then was transmitted to the Attorney General's Office for review and approval. On February 4, 2002, the Board issued the charge.

On March 1, 2002, Mr. Kuder notified the lawyers for Patient A and the children, in writing, of the charge against Dr. Eist. He told them that, unless they objected on behalf of their clients within one week, Dr. Eist would produce the subpoenaed psychiatric records to the Board. None of the patients objected to the production of the records at that time. Consequently, on March 21, 2002, Dr. Eist furnished the patients' records to the Board.

### Investigation and Closure of Mr. S's Standard of Care Allegation

Seven months later, on October 31, 2002, the Board referred Mr. S's complaint against Dr. Eist to MedChi. The Board transmitted to MedChi Mr. S's letter of complaint, the complete records of the three patients as produced by Dr. Eist, Dr. Eist's July 16, 2001 letter, and a copy of the subpoenaed pharmacy records. MedChi further referred the matter to the Maryland Psychiatric Committee's Peer Review Committee, for evaluation.

Dr. Eist appeared before the peer review committee for an interview on August 26, 2003. He provided the members a handout that contained excerpts from the patients' medical records, pertinent medical articles, and a current curriculum vitae.

The peer review committee made numerous attempts to contact Mr. S to have him appear before them, but he did not respond.

On September 24, 2003, the peer review committee met and discussed the matter. Two months later, on November 30, 2003, it issued a report to MedChi finding that "there was no evidence that [Dr. Eist] overprescribed any medication or induced psychotic symptoms by inappropriate medication practices." The report further found that Dr. Eist "behaved in a professional manner when interacting with the patients and the husband/father" and that there was "no breach of any applicable standard of care in [Dr. Eist's] treatment or conduct with the patients reviewed."

On December 1, 2003, the Board received the MedChi peer review report. Two months later, on February 5, 2004, it voted not to charge Dr. Eist on the standard of care allegation. It did not communicate that decision to Dr. Eist, however. According to Ms. Vona, the Board took the position that, because it still was prosecuting Dr. Eist for failure to cooperate with a lawful investigation, it was not necessary to inform him that the standard of care allegation had been disposed of, in his favor.

### Initial Contested Case Proceeding and ALJ Recommendation

In the meantime, in the contested case proceeding, the Board and Dr. Eist agreed that there were no disputes of material fact, and filed cross-motions for summary decision, pursuant to COMAR 28.02.01.16C.

On August 14, 2002, the ALJ issued a written Proposed Decision that made findings of facts and conclusions of law. She recommended that summary disposition be granted in

favor of Dr. Eist. The ALJ's primary conclusions were that the Board does not have an absolute right to obtain the mental health records of a patient or confidential information regarding mental health treatment of a patient, and that, when such a patient objects to a subpoena for such records issued by a disciplinary board, the *Westinghouse* factors must be applied by an independent fact finder to assess whether the Board has a compelling state interest in obtaining the records that outweighs the patient's constitutional privacy right in the records. The ALJ considered those factors and the factual circumstances and concluded that Dr. Eist had merely tried "to safeguard the rights of his Patients"; and that doing so did not constitute a failure to cooperate with a lawful investigation by the Board.

### First Final Decision of the Board

The Board noted exceptions to the ALJ's Proposed Decision. A hearing was convened, at which counsel for the parties presented oral arguments. On January 28, 2003, the Board issued a Final Decision and Order rejecting the Proposed Decision of the ALJ. It found that Dr. Eist had failed to cooperate with a lawful investigation by the Board because, beginning in April 2001, and continuing for ten months, he did not produce the psychiatric records of the three patients in response to the Subpoena. The Board determined that Dr. Eist "had no legal or ethical excuse" for not producing the records, and that his conduct constituted a violation of HO section 14–404(a)(33). The Board imposed a sanction of a reprimand and a $5,000 fine.

In the course of its decision, the Board stated that this Court, in applying the *Westinghouse* factors in the Dr. K. case, held generally that a patient's constitutional privacy interest in his psychiatric records is outweighed by the government's compelling interest in regulating the medical profession, including investigating alleged misconduct by physicians. In other words, the Board misinterpreted the *Dr. K.* holding to mean that, as between the Board and a psychiatrist's patient, the government's interest in obtaining records

for purposes of disciplinary investigation always will outweigh the patient's constitutional privacy interest in those records.

### First Circuit Court Action for Judicial Review

Dr. Eist filed an action for judicial review in the Circuit Court for Montgomery County. On July 31, 2003, after submitting memoranda of law, the parties made arguments to the court. From the bench, the court ruled that the Board had committed an error of law when it determined 1) that it had an absolute right to the mental health records it had subpoenaed, merely because it is statutorily empowered to issue subpoenas, and regardless of any constitutional or statutory right of privacy the patient has in his or her mental health records; and 2) that a doctor who fails to produce records in response to a board-issued subpoena necessarily violates HO section 14–404(a)(3), even if he acted in good faith and in reliance upon the advice of counsel. The court remanded the matter to the Board for a full contested case hearing before the ALJ. The court entered a written order to that effect on August 19, 2003.

The case was remanded to the Board, which in turn remanded it to the OAH, for further proceedings. A contested case hearing was scheduled for August 16, 17, and 18, 2004.

### Full Contested Case Hearing

In April 2004, in the course of preparing for the upcoming contested case hearing, Dr. Eist's lawyer demanded that the Board produce, as exculpatory evidence, the results of the MedChi peer review committee's assessment of Mr. S's standard of care allegation. Because he had not been told by the Board, Dr. Eist did not then know that, five months prior, the peer review committee had favorably evaluated his treatment of the three patients and that, two months prior, the Board had voted to close the standard of care allegation without filing charges.

On April 20, 2004, the Board gave counsel for Dr. Eist the peer review committee's report. It did not inform Dr. Eist, however, of its February 2004 decision to close Mr. S's stan-

dard of care complaint. The Board did not make that known to Dr. Eist until July 2004, when the ALJ ordered it to produce all exculpatory material to the doctor.

The contested case hearing went forward as scheduled. The Board called as witnesses Ms. Vona and Mr. S. Dr. Eist called as witnesses Mr. Kuder; Patient A's lawyer; Denny Rodriguez, of Professional Risk Management Services, Inc.; Richard S. Epstein, M.D., a psychiatrist; Jonas Rappaport, M.D., an expert in psychiatry and forensic psychiatry; Gustavo Goldstein, M.D., an expert in psychiatry and child psychiatry; and Roger Peele, M.D., an expert in psychiatry.

### The ALJ's Proposed Decision

The ALJ issued her written Proposed Decision on November 16, 2004. She framed the issues before her on remand as: 1) whether the Subpoena was lawfully issued, under the *Westinghouse* factors; 2) if so, whether Dr. Eist acted in good faith and upon the advice of counsel when he did not produce the subpoenaed records over his patients' objections; and 3) whether Dr. Eist's action in not producing the subpoenaed records constituted a failure to cooperate with a lawful investigation of the Board, in violation of HO section 14–404(a)(33).

The ALJ analyzed the *Westinghouse* factors and concluded that, on the facts adduced at the hearing, the Board did not have a compelling state interest in obtaining the psychiatric records of Patients A, B, and C that outweighed the patients' federally protected privacy interests in those records. The ALJ further determined that Dr. Eist had acted in good faith and upon the advice of counsel in not producing the records in response to the Subpoena. Finally, the ALJ concluded that the evidence did not support the charge of failing to cooperate with a lawful Board investigation.

### Second Final Decision of the Board

The agency prosecutor noted exceptions. Once again, the matter was presented to the Board by way of oral argument of counsel. On June 22, 2005, the Board issued its Final Decision, rejecting the ALJ's Proposed Decision. The Board

found Dr. Eist guilty of failing to cooperate with a lawful investigation and once again imposed a sanction of a reprimand and a fine of $5,000. The Board made findings of fact and then engaged in a constitutional balancing analysis, applying the *Westinghouse* factors. It concluded that the Board's interest in obtaining the patients' psychiatric records for purposes of its investigation of Mr. S's complaint outweighed the patients' privacy interests in their records. The Board further rejected the ALJ's findings that Dr. Eist acted in good faith and upon the advice of counsel in not producing the records.

### *Second Circuit Court Action for Judicial Review*

Dr. Eist again filed a petition for judicial review. The court held a hearing on March 7, 2006, at the conclusion of which it ruled from the bench. The court determined that the Board's Final Decision "was not adequately supported by the facts and the law [.]" On April 5, 2006, the court issued an order, entered the same day, reversing the decision of the Board and remanding the matter to the Board with instructions to dismiss the charge against Dr. Eist.

### *Questions Presented On Appeal*

The Board noted this appeal, posing four questions for review, which we have revised slightly:

I. Does Maryland statutory law require a psychiatrist to produce the mental health treatment records of certain patients to the Board in response to a subpoena when the records are sought to investigate a complaint that the psychiatrist's treatment is endangering those patients?

2. Was the Board's finding that it needed to obtain the psychiatric records of the three patients in order to proceed with its investigation of Mr. S's standard of care allegation against Dr. Eist: (a) supported by substantial evidence; and (b) within its area of special administrative expertise?

3. Did Dr. Eist meet his burden of establishing that the Medical Practice Act and the Confidentiality of Medical Records Act were unconstitutional as applied to the facts of his case?

4. Is the advice of counsel an absolute defense to a charge that a licensed professional failed to comply with a statutory duty to cooperate with a lawful investigation?

## STANDARD OF REVIEW

It is well established that, on appellate review of a judgment of a circuit court in an action for judicial review of the final decision of an administrative agency, the Court looks through the decision of the circuit court to review the agency's decision. *Bennett v. State Dep't of Assessments and Taxation*, 171 Md.App. 197, 204, 908 A.2d 759 (2006). In other words, our task on appellate review is identical to the circuit court's task on judicial review. Our focus is on the agency's final decision, not the circuit court's ruling.

In reviewing a final agency decision on its facts, we apply the substantial evidence test. *Cornfield v. State Bd. of Physicians*, 174 Md.App. 456, 468, 921 A.2d 893 (2007). "That test requires us to affirm an agency decision, if, after reviewing the evidence in a light most favorable to the agency, we find 'a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *Montgomery County v. Rotwein*, 169 Md.App. 716, 728, 906 A.2d 959 (2006) (quoting *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119 (1978)). Moreover, "it is the agency's province to resolve conflicting evidence and draw inferences from that evidence[;] its decision carries a presumption of correctness and validity." *Bernstein, supra*, 167 Md.App. at 751, 894 A.2d 621.

By contrast, we review an agency's legal conclusions *de novo. Hayfields, Inc. v. Valleys Planning Council, Inc.*, 122 Md.App. 616, 629, 716 A.2d 311 (1998). Nevertheless, "[w]e give 'considerable weight' to an agency's 'interpretations and applications of statutory or regulatory provisions' that are

administered by the agency." *Bernstein, supra,* 167 Md.App. at 751, 894 A.2d 621 (quoting *Md. Aviation Admin. v. Noland,* 386 Md. 556, 573 n. 3, 873 A.2d 1145 (2005)).

## DISCUSSION

### I. & II.

In its first contention, the Board argues that controlling provisions of the MPA and the CMRA required Dr. Eist to furnish the subpoenaed psychiatric records to the Board; therefore, the Board properly determined that Dr. Eist failed to cooperate with the Board's lawful investigation of Mr. S's standard of care allegation by refusing to turn over the subpoenaed records. In its second contention, the Board argues that there was substantial evidence in the agency record to support the Board's finding that the psychiatric records were needed by the Board to conduct its investigation of the standard of care allegation. The Board maintains that a reasoning mind reasonably could reach that conclusion.

■ These contentions are relevant but not central to the core issue on appeal. As the Court of Appeals in *Doe,* and this Court in *Dr. K.,* explained, there are statutory privileges that apply to communications between a psychiatrist (or social worker) and a patient (or client); there are statutes that authorize the Board of Physicians (and the Social Work Board) to subpoena records, including psychiatric (and other mental health) records, in the course of an investigation; there are statutory confidentiality protections that are afforded medical records, and mental health records in particular; and there are exceptions to those protections for licensing/disciplinary boards, such as the Board in this case, that allow them to obtain medical records, including mental health records, for purposes of investigation. Psychiatric records are privileged and confidential. Nevertheless, the psychiatrist-patient privilege must yield to a licensing/disciplinary board's statutory right to obtain such records for investigatory purposes, and the legislature has recognized, in the CMRA, that confidentiality may not bar investigating boards from obtaining records,

even when they are exceptionally private. *See* HG § 4–307(j)(1) (disclosure of mental health records without the authorization of a person in interest).

■ In the case at bar, Dr. Eist told the Board investigator that he had to obtain the consent of his patients before furnishing the subpoenaed records. We agree with the Board that, under HG section 4–307(k)(1)(v)(1), Dr. Eist's assertion was incorrect. As a "health care provider," he was required by statute to furnish the subpoenaed records to the Board without the consent of the three patients. *Id.*

What the Board overlooks in making its statutory argument, however, is that the agency's right to obtain a medical record, as conferred by statute, is not absolute.[13] That is the essential holding of the Court of Appeals in *Doe* and this Court in *Dr. K.* As discussed previously, both cases adopted the analysis of the Third Circuit Court of Appeals, in *Westinghouse,* that the federal constitution creates a privacy interest in some of the information contained in an individual's medical records and therefore a government entity's statutory right to obtain such records is qualified.[14] When the governmental interest is not a compelling one that outweighs the individual's privacy right, the records may not be disclosed.

---

13. In its brief, the Board notes that, in its first final decision, it ruled that the statutory scheme authorized it to issue a subpoena for psychiatric records; that the circuit court affirmed the Board's ruling on this issue; and that neither party appealed that decision. Accordingly, the Board argues, the issue of whether it had the power to subpoena psychiatric records is not properly before this Court. This argument misses the point. The question here is not whether the Board was authorized to issue the subpoena in question, but whether, under the facts present in the case *sub* judice, the subpoena ran afoul of the patients' constitutional privacy interests.

14. In keeping with the Supreme Court's observations in *Whalen,* the Third Circuit in *Westinghouse* recognized that there are two types of medical privacy interests—the right to keep some information in medical records confidential and the right to independence in making medical decisions. *Westinghouse* and all of the cases we discuss in this opinion concern the first type of medical privacy interest, as that is the relevant interest in the case at bar.

 Accordingly, even if a health care profession disciplinary board, as an agency of the state, has a statutorily conferred right to obtain a medical record, including a mental health record, for purposes of investigation, when the patient upon whom the record is kept directly or indirectly asserts his federal constitutional privacy right in that record, the competing interests must be balanced, using the *Westinghouse* factors.[15] Only if the government has a compelling interest in obtaining the records that outweighs the patient's privacy interest in the records may the governmental agency obtain the records. If the patient's privacy interests outweigh the competing governmental interests, or the interests are in even balance, the agency may not obtain the records. Thus, as between the government and the individual, neither the former's right to obtain the individual's medical records nor the latter's right of privacy in those records is absolute.

 In the case at bar, Patients A, B, and C, through their counsel and through Dr. Eist, asserted their federal constitutional right of privacy in their psychiatric records.[16] It is undisputed that the Board was informed, no later than July 2001, that the patients were invoking their privacy rights and had directed Dr. Eist not to produce their records. It also is undisputed that neither the Board nor Dr. Eist nor the three patients initiated litigation to enforce or quash the Subpoena. As it turned out, by March, the patients impliedly withdrew their constitutional objection to disclosure of the records. At that point Dr. Eist furnished the records to the Board.[17]

---

15. A person may waive his federal constitutional right to medical privacy. *See Doe v. Marsh,* 105 F.3d 106, 111 (2nd Cir.1997).

16. A physician has standing to assert his or her patient's privacy rights. *Singleton v. Wulff,* 428 U.S. 106, 117, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

17. In its Second Final Decision, the Board found that the patients never consented to the disclosure of their psychiatric records by Dr. Eist. That finding is not supported by any evidence in the record. The only evidence adduced established that the patients implicitly withdrew their objections to the disclosure of their records after Dr. Eist was charged

The Board's failure to cooperate charge against Dr. Eist covers the period of time after Patients A, B, and C invoked their constitutional privacy rights in their psychiatric records and before they withdrew their invocation. Because the constitutional privacy rights of the patients were in play during that time, the failure to cooperate charge against Dr. Eist could not be predicated solely upon his non-disclosure of the subpoenaed records in the face of a statutorily authorized Board-issued subpoena. It had to take into account that the patients upon whom the records were kept had communicated to the Board a constitutional privacy challenge to the production of the records, and that the non-production had taken place in the face of that challenge.

## III.

The Board's third question presented brings us to the core constitutional issue in this case. The Board contends that it was Dr. Eist's burden to show that the MPA and the CMRA "are unconstitutional as applied to the facts of this case" and, to do so, "he [had to] overcome 'every presumption' and 'every intendment' that the statute [s are] constitutional"; there was "substantial evidence" to support the Board's evaluation of the *Westinghouse* factors, for purposes of that constitutional analysis; and all of the Maryland cases, state and federal, have held that the Board's need to obtain medical records of patients for investigatory purposes outweighs any constitutional privacy right of the patients upon whom the records are kept.

The issue here is not the facial constitutionality *vel non* of the Maryland statutes that mandate that a health care provider produce, in response to a subpoena issued by a health care provider disciplinary board, the mental health records of a patient. The question is whether, in this particular case, on these particular facts, the Board, as a state agency, had a compelling interest in obtaining the records, for purposes of

---

with failing to cooperate, and that Dr. Eist produced the records to the Board thereafter.

investigation, that outweighed the patients' asserted federal constitutional interests in having the information in their psychiatric records remain private. The cases the Board cites, for the proposition that statutes are presumed to be constitutional, and that a party challenging the constitutionality of a statute bears a burden to disprove its constitutionality, are inapposite. *See Md. State Bd. of Educ. v. Bradford,* 387 Md. 353, 875 A.2d 703 (2005) (reversing a circuit court order declaring a statute unconstitutional that required the Baltimore City Public School system to eliminate its deficit by a certain date); *Galloway v. State,* 365 Md. 599, 781 A.2d 851 (2001) (holding that a harassment statute was not unconstitutional for vagueness and overbreadth); *Salisbury Beauty Schs. v. State Bd. of Cosmetologists,* 268 Md. 32, 300 A.2d 367 (1973) (affirming the constitutionality of a statute requiring that beauty schools charge only the cost of materials for services performed by students).

As is apparent from the Court of Appeals decision in *Doe,* when a patient invokes his right of privacy in his medical records, it is the investigating agency's burden, as an instrumentality of the state, to show that its statutorily recognized interest in obtaining the records is a compelling one that outweighs the patient's privacy rights in those same records, using the *Westinghouse* factors as an analytical framework. *Doe, supra,* 384 Md. at 186, 862 A.2d 996. It also is apparent from the *Doe* and *Dr. K.* opinions that this balancing analysis is the proper method to assess the constitutional significance of the underlying facts, and therefore is a question of law to be decided *de novo* by a reviewing court. *Cf. Watkins v. Sec'y, Dep't of Pub. Safety and Corr. Servs.,* 377 Md. 34, 46, 831 A.2d 1079 (2003) (noting that appellate courts make an "independent constitutional appraisal" of an administrative agency's decision when infringement on a constitutional right is implicated); *Regan v. Bd. of Chiropractic Exam'rs,* 120 Md.App. 494, 509, 707 A.2d 891 (1998) (observing that a challenge to an administrative agency's ruling on constitutional grounds is reviewed *de novo* ). *Cf. Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (holding that

appellate review of Fourth Amendment probable cause and reasonable suspicion decisions is *de novo* ); *Cartnail v. State,* 359 Md. 272, 282–83, 753 A.2d 519 (2000) (*de novo* review appropriate when Fourth Amendment implicated).

In *Doe,* for example, the circuit court, this Court, and the Court of Appeals *each* conducted an independent analysis of whether the state's compelling interest in obtaining the mental health records subpoenaed by the Social Work Board outweighed the patients' privacy interests in those records. The Court of Appeals was not reviewing the accuracy or reasonableness of the analyses by this Court or the circuit court of the constitutional balancing question; rather, it engaged in the analysis itself, and decided the case based upon that analysis. Likewise, in *Dr. K.,* when this Court held that the question of whether the psychiatric records had to be disclosed depended upon a weighing of the state's interest in the records against the patient's constitutional privacy right in the records, we did not remand the case to the circuit court to engage in that analysis; we conducted the analysis ourselves.

▮ In the case at bar, our independent application of the *Westinghouse* factors and all other relevant considerations to the material first-level factual findings made by the Board that are supported by substantial evidence in the agency record leads us to conclude that, when the Subpoena was issued, and until the patients' withdrew their privacy right assertion, the Board's governmental interest in obtaining Dr. Eist's psychiatric records of Patients A, B, and C was not a compelling interest that outweighed the patients' privacy interests in those records. In other words, considering the total circumstances of this case, there was not a compelling state interest to justify governmental invasion of the patients' rights to keep the information in their psychiatric records private, *i.e.,* undisclosed.

## 1. Type of Records Subpoenaed and the Information They Contain.

▮ The type of medical records and nature of their contents are essential starting points for an intelligent analysis

of the government need versus patient privacy question because "[t]he [federal constitutional] interest in the privacy of medical information will vary with the [patient's] condition." *Powell, supra,* 175 F.3d at 111 (holding that HIV positive transsexual had a fundamental constitutional privacy right in keeping private her HIV status and her transsexualism, caused by gender identity disorder, a "profound psychiatric" condition); *City of New York, supra,* 15 F.3d at 267 (holding that an HIV positive patient had a clear constitutional interest in keeping his medical condition private given that disclosure to others of a person's HIV positive status "potentially exposes [the patient] not to understanding or compassion but to discrimination and intolerance").

The records at issue in the case at bar are the complete psychiatric records of Patient A, who, when the complaint was lodged, had been in treatment with Dr. Eist off and on for three years and then regularly for two years; and those of Patients B and C—two of the children of Patient A and the complainant. The records sought were not limited by time, even to the two year period referenced in Mr. S's complaint letter. *See Bearman v. Superior Court,* 117 Cal.App.4th 463, 472, 11 Cal.Rptr.3d 644 (Cal.Ct.App.2004) (observing that scope of agency's subpoena for records must be appropriately limited to prevent release of unnecessary information). They also were not limited by type. They would include, therefore, not only entries documenting medications prescribed but also notes recording the innermost thoughts and feelings of the patients, expressed during private therapy sessions.

Without question, notes of psychiatric treatment sessions "'contain information of a highly private nature.'" *Doe, supra,* 384 Md. at 187, 862 A.2d 996 (quoting *Doe, supra,* 154 Md.App. at 537, 840 A.2d 744). The psychiatric records sought by the Board in this case thus were of a highly sensitive and personal type that would be likely to contain information that the patients upon whom they were kept would be embarrassed and offended to have disclosed to anyone. And, there was no implied consent to their release,

as would be the case if a patient on whom a record were kept were the complainant.

## 2. The Potential for Harm in Subsequent Non-consensual Disclosure of the Subpoenaed Records

In the *Dr. K.* case, this Court observed that the personal and sensitive nature of psychiatric records makes the potential for harm from their subsequent redisclosure "plainly apparent." 98 Md.App. at 115–16, 632 A.2d 453. Because a patient's mental health records ordinarily will contain extremely personal information that the patient would not want disclosed to anyone, and because knowledge by others of the mere fact that a person has undergone or is undergoing psychiatric treatment itself can be stigmatizing to the person, *see id.* at 116, 632 A.2d 453, the possible harm from redisclosure of such records is significant. *Cf. Shady Grove Psychiatric Group v. State,* 128 Md.App. 163, 736 A.2d 1168 (1999) (recognizing qualified federal right of privacy in mental health records and holding that State prosecuting agency was not entitled to records in question pursuant to HG section 4–306(b)(7) because it did not show that it had written procedures in effect to protect the confidentiality of the records).

 In addition, in this case the records were kept on three members of a family, a mother and two children; the complaint was initiated by the father; and the entire family was embroiled in a divorce action in which child custody was a disputed issue. Ordinarily, the fact that the parents put their mental health in issue when parental fitness is challenged in a custody action does not mean that they waive the psychiatrist/patient privilege they have with respect to their "past mental health 'diagnosis and treatment' communications and records." *Laznovsky v. Laznovsky,* 357 Md. 586, 620–21, 745 A.2d 1054 (2000). Thus, in the Domestic Case, barring exceptional circumstances, Mr. S would not have access to his wife's or children's counseling and treatment records (except to the extent that she waived her privilege). This is so because the legislature, which adopted and then repealed an exception to the privilege in child custody cases, has recognized the impor-

tance of confidentiality to the therapeutic relationship. *Id.* at 595, 745 A.2d 1054.

To be sure, once the Board obtained the psychiatric records in the case at bar, it did not re-disclose them to Mr. S. However, as we have pointed out, that only was the case because Dr. Eist was vigilant in making it known to the Board that in no event were the records in question to be turned over to Mr. S. Because the patients were not told by the Board that their psychiatric records had been subpoenaed, and that the genesis of the subpoena was a complaint by their husband/father, they had no opportunity to voice an objection to the Board's releasing their records to Mr. S, as the complainant. Clearly, disclosure of the psychiatric records of a parent and two children to the other parent in the midst of a custody battle over the children potentially would be harmful to all three of the patients.

### 3. The Injury in Disclosure to the Relationship for which the Record was Generated

When the Board first issued the Subpoena, on April 19, 2001, and when it reissued it on June 27, 2001, the psychiatrist-patient relationships between Dr. Eist and Patients A, B, and C were ongoing. Dr. Eist had been Patient A's treating psychiatrist before she and Mr. S separated, and had continued in that role during the acrimonious divorce proceedings. He also had become the treating psychiatrist for two of the children of Patient A and Mr. S. The entire family was undergoing the trauma of a stressful divorce.

The case at bar differs significantly in this respect from the *Dr. K.* and *Doe* cases. In *Dr. K.*, the doctor and the patient acknowledged that there was no longer an existing psychiatrist-patient relationship that could be harmed by disclosure of the record; indeed, their argument that the doctor did not act unethically by entering into a romantic relationship with the patient was premised upon the treatment relationship's having terminated before the romantic relationship began, and hence no longer being in existence when the records were subpoe-

naed. In the *Doe* case, the social worker was no longer treating Mr. Doe or Mrs. Doe when the complaint was filed. The privacy analyses in those cases concerned a period of time when there was no existing psychiatrist-patient relationship to be harmed.

Here, Mr. S filed his complaint when his three family members were in active treatment with Dr. Eist; and for the entire period in which the Board sought the records by subpoena, until the patients withdrew their objections, the patients were in ongoing treatment with Dr. Eist. As this Court observed in *Dr. K.*, the psychiatrist/patient relationship "is a very personal one," and therefore if the relationship exists, "any disclosure could conceivably affect [it]." 98 Md. App. at 116, 632 A.2d 453.

In its factual findings, the Board emphasized that Patient A did not end her therapeutic relationship with Dr. Eist on account of the Subpoena, or after she withdrew her privacy objection and allowed her records, and those of her children, to be disclosed to the Board. While that is true, if ending the psychiatric treatment relationship were the only means to gauge the harm to that relationship from disclosure of a patient's psychiatric records, this factor would become a Catch 22: if the relationship were not terminated, there was no harm to it, and if the relationship were terminated, it would no longer exist to be harmed. In fact, the psychiatrist-patient relationship depends in large part upon the patient's having the trust in the doctor and confidence in the privacy of the therapeutic relationship that will foster a willingness to disclose innermost thoughts. That relationship can be damaged merely by the threat that the records containing the patient's most personal thoughts will be turned over to others to examine.

### 4. The Adequacy of the Safeguards to Prevent Unauthorized Disclosure

In this case, the disclosure of the treatment records easily could have resulted in the records being redisclosed to Mr. S.

The Board did not notify any of the patients that their records had been subpoenaed; therefore, only Dr. Eist was asked whether he consented to the redisclosure of the records to the complainant, *i.e.*, Mr. S. Had Dr. Eist not been sufficiently vigilant, and simply produced the records without affirmatively stating that they should not be given to Mr. S, the records would have been automatically put in his possession.

In her testimony before the ALJ, Ms. Vona stated that mental health records subpoenaed by the Board are kept on a restricted floor of the Board's office, and are kept in the possession of the person assigned to the case. There also was evidence that there are statutes that prohibit the redisclosure of properly subpoenaed mental health records. *See* HO § 14–411.

It thus appears that there are safeguards in place to prevent redisclosure by the Board of these extremely private records. Nevertheless, the potential for harm if those safeguards are breached is great. As mentioned above, unlike the statutory confidentiality protections for redisclosure of ordinary medical records, the statutory confidentiality protections for mental health records protect redisclosure of the mere fact that a person is receiving psychiatric treatment at all. *See* HG § 4–301(b)(1) (defining the term "Directory Information" to include "information concerning the presence and general health condition of a patient who has been admitted to a health care facility"); HG § 4–301(b)(2) (excluding from "Directory Information" "health care information developed primarily in connection to mental health services"); HG § 4–302(d) (prohibiting the redisclosure of information from a medical record by a person to whom the record has been disclosed, but excluding "Directory Information").[18]

---

**18.** COMAR 10.32.02.08, entitled "Confidentiality," provides that, "[e]xcept for formal charging documents, notices of intent to deny, or as otherwise provided by law," Board proceedings are confidential; that the recommended decision of an ALJ is confidential; and that "[t]o the extent possible, even after a final order is entered by the Board, the parties shall refrain from revealing legal documents or oral statements or information that would reveal the identity of any patients referenced

### 5. The Government's Need for Access to the Documents

The Board's licensing and disciplinary functions serve an important public health and welfare function. As a general proposition, when the Board receives a complaint against a physician critical of the treatment he is rendering, there is some need for the Board to see the records documenting that treatment to determine if the treatment has been substandard. Ms. Vona, on behalf of the Board, testified at the contested case hearing that in all but rare circumstances, such as when an allegation, even if true, would not be a breach of the standard of care, or when a patient makes a complaint that evidences that the patient is not sane, the Board needs to obtain the treatment records (whether or not mental health records) of a doctor when a standard of care allegation has been made against him.

That general proposition that a need exists is not sufficient, however, to measure the government's need in a given case and weigh it against the patients' competing privacy interests in the same given case. The Board incorrectly cites *Dr. K.* as holding that the agency's interest in investigating alleged wrongdoing by a physician always will outweigh the patient's privacy interest in the information in his or her medical records. In fact, in *Dr. K.* this Court made plain that constitutional privacy challenges to disclosure of medical records to government agencies is to be made on a case by case basis. 98 Md.App. at 114–19, 632 A.2d 453; *Westinghouse, supra,* 638 F.2d at 577–78.

To be sure, the overwhelming majority of appellate courts confronted with a challenge to a government agency's obtaining or disclosing private medical information either have held,

---

in the Board order." We note, however, that in the case at bar, notwithstanding the efforts by the Board to protect the identities of Patients A, B, and C, anyone perusing the unsealed portions of the agency and circuit court records, and the briefs and record extract filed in this Court, can readily identify all of the members of the S family. We also note that the Board's web site includes its June 2005 adverse adjudication of the charge against Dr. Eist, even though the guilty finding was reversed by the circuit court.

or assumed, that the federal constitutional privacy right in medical information exists, but have determined that the government had a compelling interest in obtaining or disclosing the information that outweighed whatever privacy right the patients had in the information. *See, e.g., Doe, supra,* 384 Md. at 191, 862 A.2d 996; *Dr. K., supra,* 98 Md.App. at 103, 632 A.2d 453; *In re Search Warrant (Sealed), supra,* 810 F.2d 67; *Schachter v. Whalen, supra,* 581 F.2d 35. *But see Doe v. Borough of Barrington,* 729 F.Supp. 376, 385 (D.N.J.1990) (granting summary judgment on liability to wife and children of AIDS patient, in section 1983 action, when police officer disclosed AIDS patient's health status to neighbor of patient in connection with an automobile accident involving the patient's wife, which resulted in the medical information being re-disclosed to school officials and parents of schoolmates of the children, further resulting in unfounded discrimination against them).

■■■ That state of the decisional law does not translate, however, into an unbridled "across the board" rule favoring disclosure of subpoenaed medical records to government agencies. Particulars about the complaint that generated the subpoena for medical records—its source, nature, substance, and the relationship between the complainant and the doctor—all are pertinent to assessing the government's level of need for the subpoenaed records compared to the patients' level of privacy interest in those records.

The Board also asserts that, under established administrative law in Maryland, a reviewing court must give deference to an agency's specialized knowledge of the field it regulates, and therefore it, and not this Court (or the ALJ or the circuit court), should have the final say over whether it needs to review medical records in order to properly address a complaint about the rendering of medical care. *See, e.g., Cornfeld, supra,* 174 Md.App. at 469, 921 A.2d 893 (noting that appellate courts should give deference to "the expertise of an agency in its own field"). Again, we recognize and take into consideration the Board's own assessment of its need for the subpoe-

naed records; but the ultimate determination of whether the Board's need is compelling and outweighs the patients' privacy interests in their medical information is a federal constitutional question that we decide *de novo.*

In the case at bar, as we have stated, the source of the complaint against Dr. Eist was Mr. S, an antagonist of Patient A in an ongoing bitter divorce case, in which Mr. S had accused Patient A of taking drugs that made her unfit to parent the couple's children, and in which Patient A had responded, by means of an affidavit by Dr. Eist, defending her use of prescribed medications and her fitness, therefore, to parent the children. Thus, the complainant was a litigation adversary directly of Patient A and indirectly of Dr. Eist. The bulk of the complaint letter itself, in which Mr. S perseverated over the poor way in which he felt he had been treated by Dr. Eist during their billing dispute discussion, reflected at most a personality conflict between the two men and had nothing at all to do with the medications Dr. Eist was prescribing or any other treatment modalities he was using.

The source of the complaint was not any of the three patients, another professional, or someone with independent and objective knowledge of the treatment Dr. Eist was rendering. Mr. S is not a physician or an expert in psychopharmacology. His standard of care allegation, in its entirety, was that "in [his] opinion" Dr. Eist had "over-medicated" Mr. S's estranged wife and two sons, and that his wife had become "overly psychotic and seriously anxious and depressed" and one son had become "increasingly more agitated and difficult to control[.]" The allegation did not 1) identify any medications that Dr. Eist had prescribed for any of the three patients; 2) state the dosages of any such medication; or 3) state the period of time in which the supposed medications had been prescribed. These crucial particular facts were not included even though Dr. Eist had submitted his affidavit in the Domestic Case, approximately six months prior, setting forth the medications he had prescribed for Patient A and the diagnoses for which he had made the prescriptions.

The standard of care allegation gives no particular information about the alleged effects of the over-medication: Mr. S says nothing about one son's reaction; says that the other son has been "increasingly more agitated and difficult to control"; and says that Patient A, his wife, has become "overly psychotic." Mr. S gives no objective information to support these accusations. He offers no details—*i.e.*, no description of a particular incident in which one of the patients acted a certain way or said a certain thing. He also provides no information from which the Board could infer that he himself was qualified to give a medical assessment of any of the patients' behaviors. It is clear from the letter that he is not a doctor; and he gives no information to suggest that he has described whatever behaviors he has seen to any physician capable of assessing behavior or has sought any professional assessment of Patient A's and C's behaviors. (Again, there was no mention of any behavioral issue with Patient B.) [19]

In both the *Doe* case and the *Dr. K.* case, in addition to the general public interest in health care disciplinary boards having authority to investigate complaints against their licensees, there also was objective, particular, and compelling evidence about the government's need, in those particular factual situations, for the subpoenaed mental health records.

In *Doe*, when the complaint was made and the subpoena was issued, it already had been legally established, beyond a reasonable doubt, that the client on whom the record was kept had sexually abused his grandchild during the time he was in treatment. It was undisputed, and again had been the subject of testimony in the criminal trial, that Mr. Doe had revealed the abuse to the social worker and to his wife, and that the

---

**19.** We note that the Board maintains a "Complaint form," accessible via its website, to be used by members of the public to file complaints. On the form, at paragraph 13, the complainant must sign his or her name under oath. ("I hereby attest that the foregoing information is true to the best of my knowledge and belief, and that I am competent to make these statements.") The Board does not require, however, that a complainant use the "Complaint form." In the case at bar, Mr. S did not use the Board's "Complaint form" and did not attest to or verify the allegations set forth in his letter of complaint.

social worker had not taken action to report the abuse to authorities, as the law requires. Before issuing a subpoena for the mental health records in question, the Social Work Board conducted an investigation into the social worker's alleged child abuse reporting failure.

In *Dr. K.*, the complaint informed the Board that the complaining doctors had confronted Dr. K. and that he had admitted to being in a romantic relationship with a former patient. The complainants themselves were professionals, and expressed in the complaint their expert opinions that the relationship between Dr. K. and his patient was unethical regardless of whether it started during or after the psychiatrist-patient relationship.

In the case at bar, there was no specific, objective, factual, and descriptive information made to the Board by Mr. S with respect to the alleged over-medication; the source of the complaint, Mr. S, was an antagonist of the doctor and one of the patients; and the nature of the complaint was not such as to raise concerns about any general, systematic practice of Dr. Eist that might be adversely affecting other patients. The complaint itself, without more, was conclusory with respect to the medication of the three patients.

### 6. Whether There is an Express Statutory Mandate, Articulate Public Policy, or Other Public Interest Militating Towards Access.

As we have explained, the statutes governing the Board grant it express authority to obtain medical records, including mental health records, by subpoena. Plainly, it is the public policy of Maryland, as recognized by the legislature, that health care provider disciplinary boards have the tools necessary to investigate alleged wrongdoing by health care providers.

#### *The Dr. Barbara Solomon Cases*

It also is significant that the facts in this case stand in contrast to those in *Solomon, supra,* 155 Md.App. 687, 845

A.2d 47, and the related case of *Patients of Dr. Barbara Solomon v. Board of Physician Quality Assurance*, 85 F.Supp.2d 545 (D.Md.1999) ("Solomon Federal"), in which the Board subpoenaed the medical records of an internal medicine physician and, after she refused to produce them, disciplined her for failure to cooperate with a lawful investigation.

In the *Solomon* cases, the Board received a complaint from a patient of Dr. Solomon that the doctor had not adequately informed her about certain diagnostic procedures she was using, including her use of a computerized diagnostic system. After undertaking a preliminary investigation, the Board decided not to file charges. It advised the doctor that the patient's complaint was closed but, admonishing that it nevertheless was important for her to inform patients about "experimental techniques," provided her with a consent form to use as part of her patients' medical records. The Board advised the doctor that in six months it would "re-review" her medical practice by obtaining patient records created within that six month period to determine *inter alia* whether she was adhering to accepted standards by properly documenting diagnoses and using treatment disclosure and informed consent forms.

More than six months later, the Board issued a subpoena *duces tecum* commanding Dr. Solomon to produce the entire medical charts of 19 patients the Board had randomly selected from her patient logs.[20] Several of those patients filed suit in federal court seeking to temporarily enjoin the production of their records to the Board, on the ground that the production would violate their federal constitutional privacy rights. The district court applied the well-established four-pronged test for granting preliminary injunctive relief, *see Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manuf. Co.*, 550 F.2d 189, 194 (4th Cir.1977) (citing *Ohio Oil Co. v. Conway*,

---

**20.** Before then, the Board had subpoenaed Dr. Solomon's appointment books. She refused to produce those records, and filed an action to quash the subpoena in the circuit court. After the circuit court ruled against her, she appealed to this Court, which affirmed. *Solomon v. Bd. of Physician Quality Assurance*, 132 Md.App. 447, 752 A.2d 1217 (2000).

279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972 (1929) ((1) the likelihood of irreparable harm to the plaintiff; (2) the likelihood of harm to the defendant; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest)).

Based upon the holding in *Dr. K.*, which it commented "is clearly in line with relevant federal case law," and its own analysis of the *Westinghouse* factors, the district court concluded that the patients' likelihood of success on the merits of their constitutional privacy challenges was low:

> Given the Board's mission of identifying physicians who engage in immoral or unprofessional conduct, and the Board's goal of preventing future misconduct, courts in this Circuit would most likely find that the Board's activity [in seeking to review the medical records in question] furthers a compelling state interest. Moreover, because Maryland's statutory restrictions against disclosure of medical records are adequate to protect the Patients from widespread disclosure, courts in this Circuit would most likely find no constitutional violation.

*Solomon, supra,* 85 F.Supp.2d at 548.

Ultimately, Dr. Solomon refused to produce the patients' records in response to the subpoena, and was charged by the Board with failure to cooperate with a lawful investigation, in violation of HO section 14–404(a)(33). The Board issued a final decision against her, which she challenged, unsuccessfully, in circuit court. This Court rejected multiple challenges by Dr. Solomon to the Board's decision, including her argument that application of the *Westinghouse* factors militated against disclosure of her patients' records to the Board.

In so holding, we observed that the *Dr. K.* case was controlling, and dictated the result. Indeed, the total circumstances in *Solomon* were far more supportive of the Board than the circumstances in *Dr. K.* The patient records at issue in *Solomon* were ordinary medical records, as opposed to highly sensitive and private psychiatric records. The Board was following up on a prior investigation that, although not

resulting in a charge against Dr. Solomon, had raised sufficient concern about her informed consent practices to lead the Board to impose documentation standards upon her.

The negative information the Board gained about Dr. Solomon's informed consent practices in its prior investigation of the patient complaint against her was reason for the Board not only to insist that she change those practices going forward but also to check, thereafter, that she had done so. Clearly, the Board's interest in assuring that Dr. Solomon was following proper informed consent standards in treating all of her patients outweighed the limited privacy rights her patients had in their ordinary medical records.

Here, by contrast, the records at issue were of the most highly private and personal sort, containing intimate information about the patients; the Board had no prior information to suggest that there was any problem, let alone a systemic problem, in Dr. Eist's treatment practices; the complaint to the Board was from an interested source; and the complaint did not provide any specifics or any objective or expert criticism. In the *Solomon* cases, as in *Dr. K.*, and *Doe,* there was information garnered prior to the medical records' being subpoenaed that provided some support for the allegation against the health care provider. In this case, there was nothing. Indeed, what information was available—including the affidavit that Dr. Eist filed in the Domestic Case—did not create reason to believe that Dr. Eist was not properly treating the three patients.

Under the circumstances, the Board's interest in obtaining Patient A, B, and C's psychiatric records was not compelling and was outweighed by the patients' federal constitutional privacy interests in those records. Disclosure of the psychiatric records in question to the Board would have worked a violation of the patients' privacy rights. For that reason, as a matter of law, Dr. Eist's conduct in keeping the patients' records to himself until they withdrew their privacy challenge was not a failure to cooperate with a lawful investigation of the Board.

■■■■■■■■■■■■■■■■■■■■■

## IV.

In its final question presented, the Board asks whether acting in good faith and upon the advice of counsel is an absolute defense to a charge that a licensed professional failed to comply with a statutory duty to cooperate with a lawful investigation by the Board.

We have held in Part III that, on the facts as found by the Board and supported by substantial evidence in the record, the Board's need for the subpoenaed records was not a compelling state interest that outweighed the patients' privacy interests in their psychiatric records. In other words, the Board was not entitled to the records, as disclosure of the records in response to the Subpoena would have violated the patients' constitutional privacy rights. It therefore does not matter whether Dr. Eist acted in good faith and/or upon the advice of counsel in refusing to furnish the records in response to the Subpoena. Accordingly, we need not address this final question.

■■■■■■■ We hasten to comment, for clarity, about what our holding does *not* mean. If Dr. Eist's patients had invoked their federal constitutional privacy rights in the information in their medical records, and proper application of the *Westinghouse* factors would have supported disclosure of the records to the Board, that would not mean that Dr. Eist necessarily had failed to cooperate with a lawful investigation of the Board. In that situation, the Board would have to prove bad faith. Because the burden is on the Board, once a constitutional challenge has been communicated to it, to establish that its governmental interest in obtaining a patient's records is compelling and outweighs the patient's privacy right, so long as a doctor is acting in good faith in withholding the subpoenaed records until the patient withdraws his privacy right objection or a governmental interest/privacy interest weighing assessment is made by a court, the physician is not failing to cooperate with a lawful investigation of the Board. Although the initial burden of raising the privacy objection by communicating it to the Board rests with the doctor and the patient,

the burden is on the Board to obtain a ruling from a court on the privacy issue.

## CONCLUSION

After the Board subpoenaed the psychiatric records of Patients A, B, and C, it was informed that the patients were asserting their privacy rights in those records. It was established Maryland law at that time, and remains today, that individuals have a federal constitutional privacy right in keeping information in their medical records private from the government. To be sure, the Board was statutorily entitled to obtain the records in question without the consent of the patients. Because the patients made a privacy challenge to the disclosure of their records, however, the Board's ultimate right to obtain the records depended upon whether its interest in ascertaining the information they contained was a compelling one that outweighed the patients' federal constitutional interests in having the information in the records remain private. The *Westinghouse* case furnishes the standard by which to answer that question; and because the question is constitutional, appellate review is *de novo*.

On the facts found by the Board, as supported by substantial evidence in the agency record, the Board's interest in obtaining the patients' psychiatric records to investigate the standard of care allegation leveled by Mr. S against Dr. Eist did not outweigh the patients' privacy interests in those highly personal records. Had either the Board, Dr. Eist, or the patients sought court intervention in the period of time soon after the Subpoena was issued, the proper ruling by the court would have been that the Board was not entitled to the records in question because disclosing them would violate the patients' constitutional rights. Accordingly, Dr. Eist did not, as a matter of law, fail to cooperate with a lawful investigation of the Board by not furnishing the patients' psychiatric records to the Board, in response to the Subpoena, until the patients withdrew their privacy objection.

136

JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.