935 A.2d 1128

MARYLAND DEPARTMENT OF HEALTH
AND MENTAL HYGIENE

v.

Ida BROWN.

No. 1572, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Nov. 27, 2007.

442

Lorie A. Mayorga (Douglas F. Gansler, Atty. Gen., on brief), for appellant.

Regan Bailey, Riverdale, Sarah L. Lock, Washington, DC, for appellee.

Panel EYLER, JAMES R., BARBERA, KENNEY, JAMES A., III, (Retired, Specially Assigned) JJ.

BARBERA, J.

We are asked in this appeal to identify the appropriate legal standard to be used when determining medical eligibility for services through the Maryland Medicaid Assistance Home and Community Waiver for Older Adults Program ("Older Adults Waiver Program"). The program permits Medicaid recipients who need health-related care to receive care at home or in a community-based assisted living facility, instead of a nursing home.

The Maryland Department of Health and Mental Hygiene ("Department"), appellant, denied the application of Ida Brown, appellee, for health care services under the Older Adults Waiver Program. The Department concluded that Ms. Brown did not satisfy the level of medical care required for admission. Ms. Brown requested a hearing at the Office of Administrative Hearings ("OAH"). The Administrative Law Judge ("ALJ") affirmed the denial of Ms. Brown's application, agreeing with the Department that she was medically ineligible for the Older Adults Waiver Program. Ms. Brown appealed to the Department's Board of Review ("Board"). The Board held a hearing and thereafter issued an order affirming the ALJ's decision and adopting the "Findings of Fact and Conclusion of the Law set forth therein."

Ms. Brown sought judicial review. The Circuit Court for Baltimore City, following a hearing, reversed the Board's decision. The circuit court ruled from the bench that the ALJ and the Board applied the incorrect standard for determining Ms. Brown's medical eligibility to participate in the Older Adults Waiver Program. The court identified what it believed

to be the correct eligibility standard, applied that standard to the facts developed at the hearing before the ALJ, and concluded that Ms. Brown "is eligible for an adult waiver." The court then issued a written order reversing the decision of the Board and finding Ms. Brown eligible for benefits under the Older Adults Waiver Program.

The Department appeals the court's decision and presents two questions, which we have reworded slightly:

I. Did the ALJ, as affirmed by the Board of Review, apply the proper legal standard in determining that Ms. Brown was ineligible for the health care services under the Older Adults Waiver Program?

II. Was the ALJ's decision supported by substantial evidence in the record?

For the reasons that follow, we conclude, as did the circuit court, that the ALJ did not apply the proper legal standard in denying Ms. Brown's application for health-related assistance through the Older Adults Waiver Program. We disagree, however, with the circuit court's decision to apply what it believed to be the correct legal standard to the facts of Ms. Brown's case as they were developed at the evidentiary hearing before the ALJ. The proper standard, as we shall define it in this opinion, should be applied to Ms. Brown's case in the first instance at the agency level. Accordingly, we shall vacate the judgment of the circuit court and direct that the case be remanded to the Board, which, in turn, is directed to remand the case to the OAH for further proceedings.

## I.

The principal issue raised by this appeal requires consideration, as a preliminary matter, of the structure of Maryland's Older Adults Waiver Program and how it fits within the overall Medicaid scheme.

### A. *Medicaid and Maryland's Plan*

Medicaid is a joint federal-state program established by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*

(2000). The program provides health care to financially and medically needy individuals. *Ehrlich v. Perez,* 394 Md. 691, 701, 908 A.2d 1220 (2006); *Reese v. Dep't of Health and Mental Hygiene,* No. 514, Sept. Term 2006, 2007 WL 3227549, at *2 (Md.App. Nov.2, 2007); *see* 42 U.S.C. §§ 1396 *et seq.* Beneficiaries include low-income adults and children, the elderly, and mentally and physically disabled individuals. *Reese,* 2007 WL 3227549, at *2.

State participation in Medicaid is voluntary. *Id.* Each participating state is given some flexibility in devising its Medicaid program, but the state's plan must be approved by the federal Centers for Medicare and Medicaid Services ("CMS").[1] 42 U.S.C. § 1396a. If the state's proposed plan is approved, the state is eligible for federal funding, and the plan becomes mandatory. 42 U.S.C. § 1396a(a)(1); *Ehrlich,* 394 Md. at 702, 908 A.2d 1220; *Reese,* 2007 WL 3227549, at *2.

Maryland has elected to participate in Medicaid. The State's Medicaid plan, known as the Medical Assistance Program ("MAP"), is administered by the Department. Md.Code (2005 Repl.Vol., 2007 Supp.), § 15–103 of the Health General Article; *Reese,* 2007 WL 3227549, at *2. By participating in Medicaid, Maryland has agreed to abide by federal statutory and regulatory requirements and to provide financial assistance to qualified recipients for seven broad areas of medical treatment. *See* 42 U.S.C. § 1396a(a)(10)(A); *Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Jackson v. Millstone,* 369 Md. 575, 595–96, 801 A.2d 1034 (2002); *see also Ehrlich,* 394 Md. at 701, 908 A.2d 1220 (stating that, "[i]f a state chooses to take part in the federal Medicaid program, it must comply with the requirements set forth in Title XIX and its implementing regulations in order to receive federal matching funds"). The areas of treatment include nursing facility services for eligible persons age twenty-one and over. 42 U.S.C. § 1396d(a)(4)(A).

---

1. Until June 2001, CMS was called the Health Care Financing Administration ("HCFA"). U.S. Dep't of Health and Human Servs., http://www.hhs.gov/news/press/2001pres/20010614.html (June 14, 2001).

In 1981, Congress created as part of the Medicaid scheme the Home and Community Based Waiver Program ("HCBS"). The HCBS allows states to offer long-term care, not otherwise available through the states' Medicaid programs, to serve eligible individuals in their own homes and communities, instead of nursing facilities. 42 U.S.C. § 1396n(c)(1); *see* 42 C.F.R. § 441.300 (stating that the federal act "permits States to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to avoid institutionalization"). The HCBS permits participating states to apply for a waiver from the Secretary of the Department of Health and Human Services ("HHS") to fund community-based services, "pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or nursing facility ... the cost of which could be reimbursed under the State plan." 42 U.S.C. § 1396n(c)(1); *see* 42 C.F.R. § 435.217.

The Older Adults Waiver Program, at the center of the present appeal, is one such program authorized by the HCBS.

### B. *The Older Adults Waiver Program*

We have said that, by participating in Medicaid, MAP must provide Medicaid recipients with, among other services, "nursing facility services." 42 U.S.C. § 1396a(a)(10)(A); 42 U.S.C. § 1396d(a)(4)(A). The Older Adults Waiver Program allows participating states to seek approval from the Secretary of HHS for a plan to excuse the requirement that such services for an eligible Medicaid recipient be provided in a nursing home setting:

> The Secretary may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the

provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan.

42 U.S.C. § 1396n(c)(1).

■■■ Section 1396n(c)(1) makes plain that, to be eligible for the Older Adults Waiver Program, an individual must require the same level of care as is provided in a Medicaid nursing facility. Ascertaining that level of care is the central focus of this appeal. Bearing in mind that no participating state's Medicaid program may establish more restrictive eligibility requirements than those set by federal law, we look to the Medicaid statute and related regulations that establish the required level of care as the benchmark for eligibility under Maryland's plan. The level of care required for receipt of Medicaid nursing facility care is found in the federal statutory and regulatory provisions that define the terms "nursing facility" and "nursing facility services."

Beginning in the 1970s, the Medicaid program provided benefits for nursing home services at both the "skilled" level of nursing care and at what was known as the "intermediate" level of nursing care. Congress eliminated the distinction between skilled level of nursing care and intermediate level of nursing care in 1987, when it enacted the Nursing Home Reform Law.[2] *See* 42 U.S.C. § 1396r(a). The House Committee report said that the new term, "nursing facility services," would "not in any way alter the entitlement of current [or future] Medicaid beneficiaries or applicants . . . to what is now an [intermediate care facility] level of care." H.R. REP. NO. 100–139(I), at 453 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313–273. The new, consolidated standard of care includes services "just above 'room and board' " at one end, and "just

---

2. The Nursing Home Reform Law is the name given to the group of amendments to the sections of the Medicare and Medicaid statutes that regulate nursing facilities, which amendments were included in the Omnibus Budget Reform Act of 1987 ("OBRA"). Those amendments became effective on October 1, 1990.

below hospitalization" at the other. *Newman v. Kelly*, 848 F.Supp. 228, 239 n. 4 (D.D.C.1994).

"Nursing facility" is now defined, in relevant part, as:

[A]n institution (or a distinct part of an institution) which—

(1) is primarily engaged in providing to residents—

(A) skilled nursing care and related services for residents who require medical or nursing care,

(B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

(C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities, and is not primarily for the care and treatment of mental diseases[.]

42 U.S.C. § 1396r(a).

The phrase "nursing facility services" is defined as follows: For purposes of this subchapter, the term "nursing facility services" means services which are or were required to be given an individual who needs or needed on a daily basis nursing care (provided directly by or requiring the supervision of nursing personnel) or other rehabilitation services which as a practical matter can only be provided in a nursing facility on an inpatient basis.

42 U.S.C. § 1396d(f).

Notably, 42 U.S.C. § 1396d(f) does not require in all instances that the services be provided directly by nursing personnel. Rather, in some instances, the services need only require "the supervision of nursing personnel."

The Code of Federal Regulations contains two definitions of "nursing facility services." One regulation evidently pertains to services that are provided at facilities addressed in 42 U.S.C. § 1396r(a)(1)(A), essentially "skilled level care," and the other pertains to services that are provided at facilities addressed in 42 U.S.C. § 1396r(a)(1)(C), "intermediate level care."

The regulation that addresses skilled level care, 42 C.F.R. § 440.40(a)(i), describes skilled nursing services as those that are "[n]eeded on a daily basis and required to be provided on an inpatient basis under §§ 409.31 through 409.35 of this chapter." 42 C.F.R. § 409.31(a)(2)-(3) in turn defines "skilled services" as those that "[r]equire the skills of technical or professional personnel such as registered nurses [or] licensed practical (vocational) nurses ... furnished directly by, or under the supervision of, such personnel," on a daily basis. The second regulation defining "nursing facility services," 42 C.F.R. § 440.155, addresses the "intermediate" level of care described in 42 U.S.C. § 1396r(a)(1)(C). 42 C.F.R. § 440.155 provides, in part:

(a) "Nursing facility services, other than in an institution for mental diseases means services provided in a facility that—

(1) Fully meets the requirements for a State license to provide, on a regular basis, health-related services to individuals who do not require hospital care, but whose mental or physical condition requires services that—

(i) Are above the level of room and board; and

(ii) Can be made available only through institutional facilities[.]

Plainly, 42 C.F.R. § 440.155 does not require involvement of, or service provided by, skilled or trained medical personnel.

The parties are in apparent agreement that the nursing facility level of care that Ms. Brown claims to require for admission into Maryland's Older Adults Waiver Program (which we shall discuss next) is the level of care addressed by 42 U.S.C. § 1396r(a)(1)(C) and 42 C.F.R. § 440.155. That level of nursing care is not "skilled nursing care," but, rather, what used to be described in the federal law as "intermediate" nursing facility level of care. That is, Ms. Brown seeks to qualify under Maryland's Older Adults Waiver Program as needing, "on a regular basis, health-related care and services to individuals who because of their mental or physical condi-

tion require care and services (above the level of room and board) which can be made available to them only through institutional facilities...." 42 U.S.C. § 1396r(a)(1)(C); *see* 42 C.F.R. § 440.155.

### C. *Maryland's Regulations on the Subject*

Since Maryland began participating in Medicaid, it has been required to provide nursing facility services. The definition of "nursing facility" set forth in Maryland regulations is, not surprisingly, virtually identical to the federal definition provided in 42 U.S.C. § 1396r(a)(1)(A)-(C). Set forth in COMAR 10.09.10.01B(30)(a), "nursing facility" is defined, in pertinent part, as

an institution which is primarily engaged in providing to residents:

(i) Skilled nursing care and related services for residents who require medical or nursing care;

(ii) Rehabilitation services for the rehabilitation of injured, disabled, or sick persons; or

(iii) On a regular basis, health-related care and services to individuals who, because of their mental or physical condition, require care and services (above the level of room and board) which can be made available to them only through institutional facilities.

Maryland's definition of "nursing facility services" is found at COMAR 10.09.10.01B(31). Like the Maryland regulation defining "nursing facility," and indeed, like the definition of "nursing facility services" in 42 U.S.C. § 1396d(f), the Maryland regulation defining nursing facility services incorporates all three forms of services provided at nursing facilities: skilled nursing care, rehabilitation services, and, relevant to this case, intermediate level of care. COMAR 10.09.10.01B(31) describes those services as

services provided to individuals who do not require hospital care, but who, because of their mental or physical condition, require skilled nursing care and related services, rehabilitation services, *or, on a regular basis, health-related care and*

*services (above the level of room and board) which can be made available to them only through institutional facilities under the supervision of licensed health care professionals.* (Emphasis supplied).

The portion of COMAR 10.09.10.01B(31) that we have emphasized, unlike 42 U.S.C. § 1396r(a)(1)(C) and 42 C.F.R. § 440.155, requires that the health-related care and services at the intermediate level of care be provided *under the supervision of licensed health care professionals.* Furthermore, to the extent that the Maryland regulation governing nursing facility services seeks to parrot 42 U.S.C. § 1396d(f) (defining "nursing facility services"), we see that it does not. Whereas the Maryland regulation requires that the intermediate level of care be provided *under the supervision of licensed health care professionals,* the federal statute provides that the health-related care need only require "the supervision of nursing personnel." And certainly, the federal regulation governing nursing facility services at the intermediate level of care does not require that the care be provided under the supervision of a licensed health care provider *on a daily basis.*

### D. *Maryland's Older Adults Waiver Program*

Before 1999, Maryland had a Medicaid waiver program for older adults, which was limited to providing nursing facility services in nursing homes. Then, in 1999, the General Assembly enacted SB 593, requiring the Department to submit an application, under the Older Adults Waiver Program provided by the HCBS, to permit Maryland to allow eligible applicants to obtain nursing facility services at home or in a community-based assisted living facility. The testimony of the bill's sponsor, Senator Paula Hollinger, before the House Environmental Matters Committee, sets the stage for understanding the purpose of that legislation. We quote part of that testimony:

> The bill that I am submitting to you today directs the Department of Health and Mental Hygiene to apply to the Federal Health Care Financing Administration for an amendment to Maryland's Home and Community Based

Waiver that will expand eligible services in the community for our Medicaid eligible population.

The bill will allow citizens who have spent down their financial resources and who are in need of nursing facility services to qualify not only for skilled care in the community, but for an intermediate level of care as well. Many people prefer to remain in their home or in assisted living facilities in their communities and should not be forced to enter nursing homes in order to be eligible for Medicaid.

This bill ... clarifies the definition of intermediate level of care for those whose need for assistance falls short of the skilled level of nursing care.

Intermediate level of care includes health related care and services to individuals who do not require hospital or skilled level of nursing facility care, but whose mental, physical, functional, or cognitive condition requires health services that are above the level of room and board, are provided on a regular basis, and can be made available through institutional facilities.

SB 593 was enacted into law. Codified at Maryland Code (1994 Repl.Vol., 1999 Supp.), § 15–132 of the Health General Article ("HG"), the statute authorized the Department to seek approval from the Health Care Finance Administration (HCFA), now CMS, for the State's Older Adults Waiver Program. The statute had, at the time, three principal subsections. Subsection (a) established the standard for level of care for the waiver program. Subsection (b) required the Department to submit a new waiver application by August 1, 1999. What was then subsection (c) (now subsection(d)), directed the Department to include five specific items in the subsection (b) waiver application. Those items are now listed in (d)(1) through (5).[3] Subsequent amendments to HG § 15–

---

3. In 2004, the General Assembly added current subsection (c) and subsections (d)(6) through (10), among other changes to HG § 15–132. The 2004 amendment, among other things, authorized the Department to seek permission from CMS to use a different level of care for waiver eligibility. We are informed by the Department and *amicus curiae,*

132 have caused the renumbering of the subsections that are pertinent to this opinion. For convenience, we shall hereinafter refer to the subsections as they are numbered in the most recent version of HG § 15–132, found in the 2005 Replacement Volume of the Code.

Subsection (b) of HG § 15–132 requires the Department to submit an application for a home and community-based services waiver for individuals who are "medically and functionally impaired." The phrase "medically and functionally impaired" is defined in subsection (a)(10) as meaning "an individual who is assessed by the Department to require services provided by a nursing facility as defined in this section, and who, but for the receipt of these services, would require admission to a nursing facility within 30 days."

Subsection (a)(11) of HG § 15–132 defines "nursing facility." Despite the elimination in federal law of the distinction between "skilled nursing care" and "intermediate level of care," the statute defines "nursing facility" to include facilities that provide services to individuals requiring an "intermediate level of care." Subsection (a)(11) provides:

(i) "Nursing facility" means a facility that provides skilled nursing care and related services, rehabilitation services, and health related care and services above the level of room and board needed on a regular basis in accordance with § 1919 of the federal Social Security Act.

(ii) "Nursing facility" includes a facility that provides services to individuals certified as requiring an intermediate level of care.

"Intermediate level of care" is defined in HG § 15–132(a)(9) as follows: "Intermediate level of care," for purposes of paragraph (11)(ii) of this subsection, includes health related care and services provided to individuals who do not require hospital or a skilled level of nursing facility care but whose

Maryland Chapter, National Academy of Elder Law Attorneys, that CMS denied the request for the waiver standard set forth in subsection (c).

mental, physical, functional, or cognitive condition requires health services that:

(i) Are above the level of room and board;

(ii) Are provided on a regular basis at least 5 days in a 7–day period; and

(iii) Can be made available to the individuals through institutional facilities.

Although the definitions in subsection (a) were not explicitly conditioned on CMS approval, they were tied to the waiver program sought under then subsection (c) (now an subsection (d)) to extend to eligible older adults home care or community-based assisted living services in lieu of nursing home placement.

We have said that the controversy in the present case centers on whether Ms. Brown satisfies the medical eligibility requirements, under Maryland's Older Adults Waiver Program, for the intermediate level of care. The dispute more particularly concerns whether the Department has set the standard for intermediate-level-of-care eligibility higher than federal law, and, for that matter, state law, permits. Ms. Brown argues that the Department has set the bar higher than the law permits. The Department insists that it has not. Before addressing that dispute, we turn to the facts concerning Ms. Brown that were developed at the administrative proceedings. We also trace in greater detail the procedural history of the case that brings us to this juncture.

## II. *This Case*

Ms. Brown was born on September 13, 1922. She suffers from multiple medical conditions, including Alzheimer's Dementia, osteoarthritis, osteoporosis, elevated cholesterol levels, hypertension, bilateral cataracts, and a benign brain tumor. On April 13, 2005, Ms. Brown, with the help of her daughter, Diane Byus, applied for home and community-based services under Maryland's Older Adults Waiver Program.

At the time of her application, Ms. Brown was alert and oriented to person but was only partially oriented to time and

place. Ms. Brown was prescribed to take up to seven oral medications and various supplements, almost all of which were prescribed to be taken on a daily basis. She required assistance in taking her medications as well as using the telephone, managing money, and housekeeping.

By letter dated May 4, 2005, the Department informed Ms. Brown that her application for the Older Adults Waiver Program was denied because she did not satisfy the standard for medical eligibility (it is undisputed that she satisfies the standard of financial eligibility). Ms. Brown appealed the Department's decision to the OAH.

On August 23, 2005, an evidentiary hearing was conducted before an ALJ to determine Ms. Brown's eligibility for the Older Adults Waiver Program.[4] Ms. Byus, a registered nurse, testified at the hearing on her mother's behalf. Ms. Byus testified that she brought her mother to her home in April 2003 because Ms. Brown was unable to live alone. Ms. Byus explained that she could not leave her mother unsupervised while she worked because her mother "wouldn't drink, she wouldn't take meds, she wouldn't eat right." Ms. Byus testified that Ms. Brown also has problems with wandering, no short term memory, difficulty making decisions, and poor processing and judgment skills. Ms. Byus stated that she had

---

**4.** If an application for Medicaid benefits is denied, federal law requires that the state plan provide the applicant with the opportunity for a "fair hearing." 42 C.F.R. § § 431.200(a), 431.220(a)(1). In Maryland, the right to a fair hearing is set forth in COMAR 10.01.04.02A. The Department has delegated to the OAH the authority to hold "fair hearing" appeals. COMAR 10.01.04.04A. The ALJ's decision is based exclusively on the evidence developed at the hearing, and that decision is final and binding on the Department. *See Albert S. v. Dep't of Health and Mental Hygiene,* 166 Md.App. 726, 730–31, 891 A.2d 402 (2006). "A person who is found ineligible for Medicaid benefits after a fair hearing may seek further administrative review by the Board." *Id.* at 731, 891 A.2d 402; COMAR § 10.01.05.04. "The Board hears cases based on the record of the fair hearing, supplemented with argument of the parties." *Albert S.,* 166 Md.App. at 731, 891 A.2d 402. The Board's decision is the Department's final decision for purposes of judicial review. *Id.*

difficulty finding reliable in-home care for Ms. Brown, and, in April 2004, she placed Ms. Brown in an assisted living facility.

Ms. Byus testified that Ms. Brown sees her primary care physician, Dr. Donna Chambers, every three months unless she requires more frequent attention. Ms. Byus stated that Ms. Brown most recently met with Dr. Chambers on June 27, 2005, who supported the notion that Ms. Brown should be in a nursing facility.

During Ms. Byus's testimony, counsel for Ms. Brown offered into evidence medical records from Dr. Chambers. The records included a comprehensive history, a physical exam, a health care practitioner physical assessment, prescribed medication treatment orders, and physician orders. Counsel for the Department stipulated to the admissibility and authenticity of the medical records. The ALJ also admitted into evidence, without objection by counsel for the Department, Ms. Brown's medical records from a physical examination with Dr. Chambers that took place on March 15, 2005.

Counsel for Ms. Brown then offered into evidence a medical report from a physical examination with Dr. Chambers on June 27, 2005, over two months after the Department reviewed Ms. Brown's application to the waiver program. Counsel for the Department objected to the admission of the report on the ground that the examination took place after the Department's consideration of Ms. Brown's application. The ALJ sustained the objection, stating:

If you [Ms. Brown] wish to provide [the medical record] to Dr. Friedman or the Department of Health after this hearing, then obviously you're free to do so. But my understanding of my task is that it is to determine whether the decision that has already been made based on the information that the Department was provided at the time of the decision was correct.

Counsel for Ms. Brown also sought to have admitted into evidence a letter from Dr. Chambers, dated June 28, 2005, which provided that Ms. Brown needed assistance with "all activities of daily living" and that she "would be a danger to

herself if left unsupervised." Counsel for the Department objected to the admission of the letter, again on the ground that it was dated two months after Ms. Brown's application was considered. The ALJ admitted the letter, stating that it was unclear to her whether the statements contained in the letter referred to Ms. Brown's condition at the time her application was reviewed or her current condition.

Counsel for Ms. Brown then sought to have admitted a second letter from Dr. Chambers, dated August 18, 2005. The letter stated that Ms. Brown, in Dr. Chambers's opinion, required placement in a "skilled nursing facility." Counsel for the Department objected on the grounds that the letter was dated after Ms. Brown's application was considered, and Dr. Chambers was not available for cross-examination, rendering it unreliable hearsay. The ALJ overruled the objection, reasoning that counsel for the Department waived the objection by not making it with regard to any previously admitted documents.

Barbara Best, a registered nurse for the Delmarva Foundation for Medical Care ("Delmarva"), also testified at the hearing before the ALJ. She explained that Delmarva reviews applications from individuals seeking Medicaid services through the State, and that she has reviewed applications for long-term care for Delmarva for seventeen years. Ms. Best described the process of applying for the Older Adults Waiver Program. She explained that an applicant first fills out the required paperwork, which is then reviewed by a nurse. If the nurse denies the application, the application is sent to a physician advisor for review.

Dr. Barry Friedman, medical director of the long-term care and waiver services section of the Department, testified at the hearing. The ALJ received him as an expert in the area of general medicine. Dr. Friedman testified that an applicant is eligible for the Older Adults Waiver Program in one of three ways: if the applicant: (1) has a "skilled nursing need," which requires, on a daily basis, the hands-on activity of a nurse or a physician; (2) requires physical therapy or rehabilitative ther-

apy, ordered by a physician and performed by a licensed therapist, five days per week; or (3) requires "health-related services above the level of room and board that could only be provided in an institutional setting under licensed health care professionals." Dr. Friedman testified that applicants must require the "health-related services" on a "regular" basis, which he testified "has a long-standing interpretation of daily basis."

Dr. Friedman testified that applicants for the Older Adults Waiver Program are initially put on a waiting list. Once an applicant reaches the top of the list, the Department conducts an assessment to determine the applicant's eligibility for a waiver. He testified that, when he conducts an assessment, he "must consider the medical conditions at the time of the application." He stated that Department policy prevents him from considering evidence of an applicant's medical condition that post-dates the date of application.

Dr. Friedman reviewed Ms. Brown's application on April 13, 2005. He considered the application, the intensive physical done a year before, and the AER nurse's evaluation. Dr. Friedman testified that Ms. Brown "clearly did not meet any of the three criteria that I've explained, the three levels, where I could give a level. Therefore, I could not overrule the physicians and nurses at the Delmarva Foundation, and I upheld the decision to deny." Dr. Friedman further testified that "just the use of a caretaker or custodial care" does not medically qualify a person for the program. He read at the hearing the June 2005 and August 2005 letters submitted by Dr. Chambers, finding them inconsistent with application information and not grounds sufficient to warrant a change in opinion. He concluded that Ms. Brown did not meet the nursing facility level of care necessary for acceptance into the Older Adults Waiver Program.

Counsel for the Department argued in closing that the standard of eligibility for nursing facility services is "whether or not a person needs licensed health care professionals on a daily basis." Counsel further argued that Ms. Brown "does

not have any needs that rise to the level of needing a nurse or some sort of health care practitioner, licensed health care practitioner, on a daily basis."

On October 5, 2005, the ALJ issued a written decision upholding the Department's denial of Ms. Brown's application to the Older Adults Waiver Program. The ALJ set forth the standard of care that, in her view, an applicant must require to qualify for the Waiver Program. The ALJ wrote: "The evidence fully supports that [Ms. Brown] can use the assistance and supervision provided to her in an assisted-living facility. The question to be addressed in this case, however, is whether [Ms. Brown's] needs require *skilled nursing facility* level of care." The ALJ continued:

In order to receive the level of care requested by the Appellant, an applicant would have to require either skilled nursing care, such as daily injections, surgical dressing changes, or tube feedings; rehabilitative services, such as occupational, physical, or speech/language therapy; or some sort of health related services, above the simple provision of room and board, that can only be provided by a licensed professional, such as monitoring of an individual frequently in and out of congestive heart failure. Custodial services, such as help with activities of daily living ("ADLs") or medication management, are not sufficient on their own to qualify for services.

The ALJ concluded that, although Ms. Brown requires custodial care and supervision, she does not need twenty-four-hour supervision by licensed health-care professionals. The ALJ determined that Ms. Brown's medical needs were not "severe enough to merit provision in an institutional setting." Concluding that Ms. Brown "does not require a nursing facility level of care," the ALJ ruled that Ms. Brown is "not medically eligible to receive reimbursement for nursing facility services from the Medical Assistance Program under COMAR 10.09.10.01B(31)."

The ALJ decided that the two letters from Dr. Chambers, dated June 28, 2005 and August 18, 2005, were "not sufficient

to rebut Dr. Friedman's testimony." The ALJ concluded that the June 28, 2005 letter, in which Dr. Chambers wrote that Ms. Brown would be a danger to herself if left unsupervised, did not demonstrate that Ms. Brown required a skilled nursing level of care. The ALJ also concluded that the August 18, 2005 letter, in which Dr. Chambers opined that Ms. Brown required a skilled nursing facility level of care, was "too conclusory to overcome the live testimony and documentary evidence opposing this opinion." We shall discuss those evidentiary rulings later in this opinion.

Ms. Brown took an appeal to the Board. Following a hearing on January 26, 2006, the Board adopted the ALJ's "Findings of Fact and Conclusion of the Law set forth [in the written decision]." Ms. Brown sought judicial review of the Board's decision in the Circuit Court for Anne Arundel County. The case was subsequently transferred to the Circuit Court for Baltimore City, at the request of Ms. Brown, who at the time was a party to a related declaratory judgment action in Baltimore City.

On August 4, 2006, the Circuit Court for Baltimore City held a hearing on the matter. The Department acknowledged that the ALJ mistakenly referred to "skilled nursing care" as the standard for medical eligibility for the Older Adults Waiver Program. The Department nonetheless defended the standard applied by the ALJ, arguing that Ms. Brown properly was denied benefits because she did not require medical care on a daily basis "performable only by a licensed professional." Counsel added: "The standard for requiring medical administration services that are professional is that you're unstable, that you need to be monitored closely."

Ms. Brown argued that the Department, the ALJ, and the Board had set the eligibility standard too high by requiring a showing that she needed monitoring on a daily basis by a licensed health care provider. Ms. Brown argued that the standard for "intermediate care" set forth in HG § 15–132(a)(9) was the proper standard for eligibility under the waiver program, and she qualified under that standard.

The circuit court agreed with Ms. Brown. Ruling from the bench, the court concluded that the ALJ applied the incorrect legal standard in assessing Ms. Brown's eligibility for the waiver program. The court further ruled, based on the factual findings by the ALJ, that Ms. Brown was eligible for services through the Older Adults Waiver Program, by application of the definitions in HG § 15–132(a) of "nursing facility," and "intermediate level of care." The court also ruled that the ALJ erred in discounting evidence provided by Dr. Chambers and in failing to apply the facts adduced at trial to the appropriate standard of eligibility.

When asked by the Department at the close of the hearing to consider remanding the case to the OAH so that the ALJ could apply the proper eligibility standard to the facts of Ms. Brown's case, the court declined, stating: "They [the Board] already had their shot to essentially internally remand, and they elected not to do that and, I believe, in exercising my discretion, I think it would be more appropriate to reverse than to remand."

This appeal followed.

### III. *Standard of Review*

The appellate courts review an administrative agency's decision under the same standards as does the circuit court. *Miller v. Comptroller of Maryland,* 398 Md. 272, 280, 920 A.2d 467 (2007). "A court's role in reviewing an administrative agency adjudicatory decision is narrow, it is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Id.* at 280, 920 A.2d 467 (citations and internal quotation marks omitted).

We review the agency's decision on the facts by application of the substantial evidence test. *Cornfeld v. State Bd. of Physicians,* 174 Md.App. 456, 468–69, 921 A.2d 893 (2007). "That test requires us to affirm an agency decision, if, after reviewing the evidence in a light most favorable to the

agency, we find a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Md. State Bd. of Physicians v. Eist,* 176 Md.App. 82, 114, 932 A.2d 783 (2007) (citations and internal quotation marks omitted). It is within the province of the agency, not us, to resolve conflicting evidence and draw inferences from that evidence. *Id.* The agency's decision "carries with it a presumption of correctness and validity." *Id.* (citation and internal quotation marks omitted).

■ We give some deference to an agency's conclusions of law. *Miller,* 398 Md. at 281, 920 A.2d 467.

The *Miller* Court said, in that regard:

"Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected."

*Id.* (quoting *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 572, 873 A.2d 1145 (2005)) (some citations and internal quotation marks omitted).

■ Such deference, however, does not preclude us from reviewing the agency's legal conclusions and correcting them if they are wrong:

"With respect to an agency's conclusions of law, we have often stated that a court reviews *de novo* for correctness. We frequently give weight to an agency's experience in interpretation of a statute that it administers, but it is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong."

*Miller,* 398 Md. at 282, 920 A.2d 467 (quoting *Schwartz v. Maryland Dep't of Natural Res.,* 385 Md. 534, 554, 870 A.2d 168 (2005)). Put another way: "[E]ven though an agency's interpretation of a statute is often persuasive, the reviewing

court must apply the law as it understands it to be." *Christopher v. Montgomery County Dep't of Health and Human Servs.*, 381 Md. 188, 198, 849 A.2d 46 (2004) (citation and internal quotation marks omitted).

## IV. *Discussion*

The Department asks us to reinstate the decision of the Board upholding the denial of Ms. Brown's application for the Older Adults Waiver Program. The Department argues that the Board did not err in adopting the ALJ's factual findings and legal conclusions. In its first (and principal) contention, the Department insists that the ALJ applied the correct legal standard for determining the level of care required for medical eligibility for the waiver program. In its second contention, the Department argues that the ALJ correctly discounted the June 27, 2005 physical examination report by Ms. Brown's personal physician, Dr. Chambers. The Department asserts that the ALJ correctly determined that, because the information contained in the report post-dated the Department's denial of Ms. Brown's application to the Waiver Program by approximately two months, the document was irrelevant to the question of whether the Department correctly denied the application. We shall consider each contention in turn.

### A. Did the ALJ apply the correct legal standard for determining medical eligibility for the Older Adults Waiver Program?

We begin our assessment of this issue by repeating that neither party asserts that Ms. Brown requires skilled nursing care. Indeed, the Department acknowledged at the hearing before the circuit court that the ALJ had mistakenly used the word "skilled" in her written decision. The parties further agree that, for Ms. Brown to be medically eligible for the Older Adults Waiver Program, she must require a level of care that is provided at Medicaid nursing facilities. The parties disagree, however, on the precise level of care provided at nursing facilities that an individual must require in order to qualify for participation in the Older Adults Waiver Pro-

gram. They further disagree about whether HG § 15–132 is even relevant to the inquiry.

Ms. Brown asserts that HG § 15–132(a)(9) and (11) define the level of care needed to satisfy the medical eligibility requirement for admission into Maryland's Older Adults Waiver Program because that is the specific level of care described by the General Assembly in seeking approval from HCFA (now CMS) to establish the waiver. For convenience, we repeat the relevant portions of HG § 15–132(a)(9) and (11). Subsection (a)(11) provides:

(i) "Nursing facility" means a facility that provides skilled nursing care and related services, rehabilitation services, and health related care and services above the level of room and board needed on a regular basis in accordance with § 1919 of the federal Social Security Act.

(ii) "Nursing facility" includes a facility that provides services to individuals certified as requiring an intermediate level of care.

Subsection (a)(9) provides:

"Intermediate level of care," for purposes of paragraph (11)(ii) of this subsection, includes health related care and services provided to individuals who do not require hospital or a skilled level of nursing facility care but whose mental, physical, functional, or cognitive condition requires health services that:

(i) Are above the level of room and board;

(ii) Are provided on a regular basis at least 5 days in a 7–day period; and

(iii) Can be made available to the individuals through institutional facilities.

The Department argues that HG § 15–132(a) only provided definitions for terms used in subsequent subsections of that section, and those provisions were not intended to establish, and do not establish, the level of nursing facility services needed for admission to the Older Adults Waiver Program. The Department insists that the medical eligibility standard for the nursing facility level of care required for admission

into the Waiver Program is the standard that is spelled out in COMAR 10.09.10.01B(31) (defining nursing facility services). We repeat that regulation, for convenience: "Nursing facility services" are

services provided to individuals who do not require hospital care, but who, because of their mental or physical condition, require skilled nursing care and related services, rehabilitation services, *or, on a regular basis, health-related care and services (above the level of room and board) which can be made available to them only through institutional facilities under the supervision of licensed health care professionals.*

(Emphasis supplied).

The Department argues that COMAR 10.09.10.01B(31) "combines attributes formerly divided between a 'skilled nursing facility' and an 'intermediate care facility,' by parroting the language of [42 U.S.C. § 1396r(a)(1)(C) ]," and is identical to the federal standard for nursing facility level of care. We disagree. We have pointed out that 42 C.F.R. § 440.155, which is the federal regulation concerning nursing facility services at the intermediate level of care, and 42 U.S.C. § 1396r(a)(1)(C), which defines nursing facility care at the intermediate level of care, do not require direct involvement of, or even supervision by, licensed health care professionals. Neither does the statutory definition of "nursing facility services," set forth in 42 U.S.C. § 1396(d)(f).

As we see it, COMAR 10.09.10.01B(31) is written broadly to include all three levels of care that, since 1990, come within the meaning of "nursing facility services." We believe that the inclusion of the phrase "under the supervision of licensed health care professionals," relates not to the level of care but to the requirement that all nursing facilities be staffed with the requisite number of licensed health care professionals necessary to care for residents at those facilities.

But even if we are wrong in that regard, it remains that Maryland cannot set a higher bar for eligibility under the Older Adults Waiver Program than is prescribed by the federal government. *See Alexander,* 469 U.S. at 289 n. 1, 105 S.Ct. 712; *Jackson,* 369 Md. at 595–96, 801 A.2d 1034. As we

have noted, nowhere that we can discern in the federal law is it required that the intermediate level of care be "under the supervision of licensed health care professionals." If, as the Department seems to be urging, Maryland's regulation governing nursing facility services requires that all levels of care (not just skilled care) be performed under the supervision of a licensed health care professional, then it is more restrictive than federal law and cannot be sustained.

■ We conclude that HG § 15–132(a)(9) sets forth the federal standard for intermediate level of care. It is the standard that the General Assembly adopted for waiver services at the intermediate level of care, and, to the extent that it differs from COMAR 10.09.10.01B(31), it controls over the regulation. *See Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.,* 389 Md. 156, 180, 884 A.2d 112 (2005); *Cecil County Dep't of Soc. Servs. v. Russell,* 159 Md.App. 594, 611, 861 A.2d 92 (2004). Our conclusion is bolstered by the fact that the definition set forth in HG § 15–132(a)(9) for intermediate level of care is entirely consistent with the definition of nursing facility care in 42 U.S.C. § 1396r(a)(1)(C) and the regulation governing nursing facility services at the intermediate level of care in 42 C.F.R. § 440.155.

We therefore hold that the standard that the Department must follow in determining medical eligibility for the Older Adults Waiver Program for an applicant who needs intermediate care is the standard reflected in the definition of intermediate level of care in HG § 15–132(a)(9). Under that standard, the applicant need only require "health related care and services"; "above the level of room and board"; that are "provided on a regular basis at least 5 days in a 7–day period"; and "[c]an be made available to the individuals through institutional facilities."[5] The Department did not ask the ALJ to apply that standard, and the ALJ certainly did not apply that standard.

---

5. When HG § 15–132 was enacted in 1999, the definition of intermediate level of care provided that the health services defined therein must be required to be provided "on a regular basis." In 2004, the General Assembly amended HG § 15–132(a)(9) such that, now, the health ser-

We agree with Ms. Brown (and therefore with the circuit court) that the ALJ applied the incorrect legal standard when assessing whether the Department mistakenly found Ms. Brown to be medically ineligible for the waiver program. The Board's decision adopting the ALJ's conclusions of law must therefore be vacated.

But, unlike the circuit court, we shall not endeavor to apply to the particulars of Ms. Brown's case the correct standard for assessing medical eligibility at the intermediate nursing facility level of care. That is the job, in the first instance, of the agency, not us. *See Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 270, 734 A.2d 227 (1999) ("Generally, when an administrative agency utilizes an erroneous standard and some evidence exists, however minimal, that could be considered appropriately under the correct standard, the case should be remanded so the agency can reconsider the evidence using the correct standard."). We therefore shall vacate the judgment of the circuit court and remand the case with the direction that the court vacate the decision of the Board and remand the case to the Board, for further remand to the OAH for application of the proper legal standard.

**B. Did the ALJ err in discounting evidence relating to Ms. Brown's physical condition post-dating the review of the Department's denial of her waiver application?**

The circuit court ruled that "the ALJ also erred in discounting the evidence provided by Dr. Chambers and by failing to

---

vices are those that are "provided on a regular basis at least 5 days in a 7–day period."

The last of the requirements under HG § 15–132(a)(9), that the health-related services be those that "can be made available to the individuals through institutional facilities," does not include the word "only," as does 42 U.S.C. § 1396r(a)(1)(C) (addressing services "which can be made available to them only through institutional facilities"). We believe the omission of the word "only" in HG § 15–132(a)(9) is attributable to the fact that the statute was enacted for the purpose of seeking the Older Adults Waiver Program, which of course does not require that the services can only be provided in a nursing facility setting.

apply the facts as set forth by Dr. Chambers, as well as those provided through other medical records introduced into evidence, to the appropriate standard of eligibility." The Department disagrees with the circuit court's assessment of the ALJ's evidentiary rulings. The Department claims that the ALJ considered all of the medical evidence that was *properly* before it and that the evidence presented at the hearing supports, by substantial evidence, the ALJ's determination that Ms. Brown did not meet the nursing facility level of care.

Because we have concluded that the ALJ erred in affirming the Department's denial of Ms. Brown's application, we need not ascertain whether the ALJ's decision was supported by substantial evidence. For the benefit of the Board and the ALJ on remand, we shall address the Department's argument that the ALJ, when reviewing the Department's denial of Ms. Brown's application for the Older Adults Waiver Program, properly declined to consider evidence of Ms. Brown's medical condition post-dating the review of her waiver application.

The Department does not contest that Ms. Brown was entitled to an administrative hearing to review the Department's denial of her waiver application. Indeed, the Department directs us to COMAR 10.01.04.02, which provides for a "fair hearing." *See supra* note 4. The Department does argue, however, that services rendered through the Older Adults Waiver Program, unlike services to which a state Medicaid plan recipient is entitled, are not subject to the same Medicaid fair hearing requirements.

Ms. Brown responds that the ALJ was obligated to conduct a hearing that includes consideration of all evidence relevant to her eligibility for the Older Adults Waiver Program. She argues that the State has similar due process obligations in determining eligibility for the Waiver Program as it does when determining eligibility for mandatory Medicaid benefits. As such, Ms. Brown argues, the ALJ erred in excluding the June 27, 2005 medical report on the ground that the examination took place after the Department assessed Ms. Brown's application.

Federal law requires states to provide an opportunity for a fair hearing to any individual whose application or claim for Medicaid is denied or not acted upon with reasonable promptness. *See* 42 U.S.C. § 1396a(a)(3); *see also Albert S.,* 166 Md.App. at 748, 891 A.2d 402 ("States participating with the federal government in the Medicaid program are required to provide applicants who have been denied benefits an opportunity for a fair hearing and a final decision of the matter."). A Medicaid fair hearing must meet the due process requirements set forth in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). *See* 42 C.F.R. § 431.205; *see generally Goldberg,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (requiring, *inter alia,* the opportunity to be heard, an opportunity to confront and cross-examine adverse witnesses, and that the decision to a recipient's eligibility rest solely on the legal rules and evidence adduced at the hearing). "Federal and state regulations further require that, upon consideration of all of the evidence presented at a fair hearing, the ALJ must render a final decision as to a person's eligibility for Medicaid." *Albert S.,* 166 Md.App. at 748–49, 891 A.2d 402 (citations omitted); *see* C.F.R. § 431.244(a). Assuming the sufficiency of the evidence, it is the ALJ's obligation to render a decision on the merits concerning an applicant's eligibility for Medicaid. *Albert S.,* 166 Md.App. at 750, 891 A.2d 402.

 "[W]hen a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law." *Doe 1–13 v. Chiles,* 136 F.3d 709, 714 (11th Cir.1998) (citations omitted); *accord Bryson v. Shumway,* 308 F.3d 79, 89 (1st Cir.2002); *Lewis v. N.M. Dep't of Health,* 94 F.Supp.2d 1217, 1236 (D.N.M.2000), *aff'd* 261 F.3d 970 (10th Cir.2001). Therefore, as we see it, a state's obligation to comply with fair hearing requirements in federal and state law for an "optional" service such as the Older Adults Waiver Program is no less than the state's obligation when a "mandatory" service is involved.

COMAR § 10.01.04.06 sets forth the fair hearing requirements established under federal law for applicants who have

been denied Medicaid services. Of particular relevance to the present case is Part D of the regulation, which provides:

> When a hearing involves medical issues, such as those concerning a diagnosis, an examining physician's report or a medical review team's decision, an additional medical assessment of the appellant's condition shall be obtained and made part of the record if the hearing examiner considers it necessary. Any additional medical assessment shall be made by a person other than a person who made the original medical determination and shall be obtained at the Department's expense.

 By including the requirement that "an additional medical assessment of the appellant's condition shall be obtained and made part of the record if the hearing examiner [i.e., the ALJ] considers it necessary," the Department has not limited the medical evidence at the hearing to the evidence that the Department considered in its review for medical eligibility. We recognized as much in *Albert S.*, when we concluded that an individual who applies for Medicaid eligibility on the basis of disability is entitled to have the ALJ consider recent medical evidence that was not available to the medical experts on the State Review Team. *See* 166 Md.App. at 748–50, 891 A.2d 402.

Because the ALJ was required to provide Ms. Brown with a full evidentiary hearing, she erred in excluding from evidence the June 27, 2005 medical report concerning Dr. Chambers's physical examination of Ms. Brown. The August 23, 2005 hearing before the ALJ was intended to provide Ms. Brown with the benefits of a full evidentiary hearing. *See id.* Contrary to the view of the ALJ, urged upon her by the Department, she was not limited in her review of the evidence to the record before the Department.

On remand from the circuit court, the Board shall vacate the decision of the ALJ and remand the case to the OAH for further proceedings. At those proceedings, the ALJ shall give appropriate consideration to the June 27, 2005 medical report of Dr. Chambers in deciding whether Ms. Brown satisfies the

correct standard of medical eligibility for the Older Adults Waiver Program, as we have stated it in this opinion. Furthermore, to the extent that the ALJ discounted the June 28, 2005 and August 18, 2005 letters written by Dr. Chambers on behalf of Ms. Brown because they, like the June 27, 2005 report, post-dated the Department's review of Ms. Brown's application, the ALJ on remand should give appropriate consideration to those letters as well.

JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH DIRECTIONS THAT THE DECISION OF THE BOARD OF REVIEW OF THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE BE VACATED, AND THE CASE REMANDED TO THAT BOARD FOR REMAND TO THE OFFICE OF ADMINISTRATIVE HEARINGS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

APPELLANT TO PAY THE COSTS.